IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-123

No. 308A21

Filed 16 December 2022

IN THE MATTER OF C.G.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 278 N.C. App. 416, 2021-NCCOA-344, affirming an order entered on 7 February 2020 by Judge Doretta Walker in District Court, Durham County. On 27 October 2021, this Court allowed respondent's petition for discretionary review to consider an additional issue. Heard in the Supreme Court on 20 September 2022.

*Joshua H. Stein, Attorney General, by James W. Doggett, Deputy Solicitor General, and South A. Moore, General Counsel Fellow, for the State.*

*Glenn Gerding, Appellate Defender, by Katy Dickinson-Schultz, for respondent-appellant.*

*Disability Rights North Carolina by Lisa Grafstein, Holly Stiles, and Elizabeth Myerholtz for Disability Rights North Carolina, National Association of Social Workers, Promise Resource Network, and Peer Voice North Carolina, amici curiae.*

ERVIN, Justice.

This case and its five companions raise an important issue regarding the constitutional rights of those who face the prospect of involuntary commitment as a result of mental illness. More specifically, these cases require us to address the

question of whether a trial court presented with a petition to have an individual involuntarily committed for additional inpatient treatment pursuant to N.C.G.S. § 122C-261 *et seq.* violates that person's due process rights by conducting a hearing concerning the petition in the absence of counsel representing the State on the grounds that the use of such procedures violates the respondent's right to an impartial tribunal. In addition, respondent argues that, even if no due process violation occurred in this case, the trial court's written findings of fact failed to support its conclusion that respondent was mentally ill and posed a danger to himself so that he could be involuntarily committed pursuant to N.C.G.S. § 122C-268(j).

¶ 2        A majority of the Court of Appeals held that the proceedings, as conducted, did not result in a due process violation and that the trial court's findings were sufficient to support a prima facie inference that respondent could not care for himself. *In re C.G.*, 278 N.C. App. 416, 2021-NCCOA-344, ¶¶ 25, 36. The dissenting judge disagreed with his colleagues' decision with respect to the due process issue without directly commenting upon the sufficiency of the trial court's findings. *Id.* ¶ 46 (Griffin, J., dissenting). After careful consideration of the arguments advanced in the parties' briefs, we affirm the decision of the Court of Appeals with respect to the due process issue for the reasons set forth in *In re J.R.*, ___ N.C. ___, 2022-NCSC-127, but reverse the Court of Appeals' decision to affirm the trial court's order to have

respondent involuntarily committed on the grounds that the record evidence and the trial court's findings did not support that determination.

## I.     Background

### A.  Involuntary Commitment Statutory Scheme

Any person "who has knowledge of an individual who has a mental illness and is either (i) dangerous to self, as defined in [N.C.G.S. §] 122C-3(11)a., or dangerous to others, as defined in [N.C.G.S. §] 122C-3(11)b., or (ii) in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness," may file an affidavit delineating the facts upon which the affiant's opinion is based and seeking the entry of an order to have the respondent taken into custody for examination.  N.C.G.S. § 122C-261(a) (2021).  If, after reviewing the affidavit, a clerk or magistrate "finds reasonable grounds to believe that the facts alleged in the affidavit are true" and that the respondent appears to satisfy one of the three relevant statutory criteria, the clerk or magistrate shall order that the respondent be taken into custody.  N.C.G.S. § 122C-261(b).

After the respondent has been taken into custody, a commitment examiner has twenty-four hours within which to determine if the respondent "has a mental illness" and "is dangerous to self . . . or others" so as to warrant inpatient commitment.

N.C.G.S. § 122C-263(c), (d)(2).[1]  In the event that the examiner concludes that inpatient commitment is justified, the respondent will be admitted for treatment to a mental health unit known as a "24-hour facility," N.C.G.S. §§ 122C-3(14)(g), -262(d) (2021), with the examiner being required to prepare a report that specifically recommends that the respondent receive inpatient treatment and having the option, if no one has already sought to have the respondent involuntarily committed, to file an involuntary commitment petition after completing the examination, N.C.G.S. § 122C-261(d).  Within twenty-four hours after the respondent's arrival at a 24-hour facility, a physician, other than the one that conducted the initial examination, must examine the respondent and, upon determining that the respondent is mentally ill and constitutes a danger to himself or others, hold the respondent at the facility pending a hearing before the district court, with the second examiner also being required to prepare a report containing his or her commitment recommendation. N.C.G.S. § 122C-266(a), (c).

Within ten days after the respondent has been taken into custody, the district court must hold a hearing for the purpose of determining whether the respondent should remain involuntarily committed.  N.C.G.S. § 122C-268(a).  At this hearing,

---

[1] The commitment examiner must be a physician, eligible psychologist, or other health, mental health, or substance abuse professional certified to perform evaluations by the Secretary of the Department of Health and Human Services.  N.C.G.S. §§ 122C-3(8a), -263.1.

the respondent is entitled to be represented by counsel of his own choosing or appointed by the trial court, N.C.G.S. §§ 122C-268(d), -270(a); to have the commitment reports filed in support of the decision to commit the respondent and other relevant documents shared with the trial court, N.C.G.S. §§ 122C-263(3), -266(c), -269(b); and to have the right to confront and cross-examine witnesses, including the commitment examiners, N.C.G.S. § 122C-268(f). As a prerequisite for the respondent's continued involuntary commitment, the trial court must find "by clear, cogent, and convincing evidence" that the respondent is mentally ill and presents a danger to himself or others and make written findings of fact in support of that determination. N.C.G.S. § 122C-268(j). If the trial court makes the necessary findings, it is authorized to order that the respondent continue to be involuntarily committed in an inpatient facility for a period not to exceed ninety days. N.C.G.S. § 122C-271(b)(2).

**B. C.G.'s Case**

¶ 6    On 30 January 2020, Dr. Phillip Jones, a physician practicing at Duke University Medical Center, signed an affidavit and petition requesting that respondent be involuntarily committed on the grounds that he was mentally ill and presented a danger to himself. According to the affidavit, respondent had arrived at the emergency department earlier that day while exhibiting "psychotic and disorganized" behavior, with his Assertive Community Treatment team having been

"unable to stabilize his psychosis in the outpatient environment."[2]  According to Dr. Jones, respondent needed to be hospitalized "for safety and stabilization" given that he was "so psychotic [that] he is unable to effectively communicate his symptoms and [he] appears to have been neglecting his own self-care," with his difficulties having included a failure to take his prescribed medication.  In addition, Dr. Jones completed a "First Examination for Involuntary Commitment" report that contained the same findings.  Based upon this affidavit, a magistrate concluded that there were reasonable grounds to believe that respondent was mentally ill and a danger to himself and ordered that respondent be taken into custody for inpatient treatment at Duke.

On 31 January 2020, Dr. Miles Christensen completed a second examination, during which he observed that respondent had "talk[ed] to other people in the room during [the] interview," claimed that "god[']s people [were] putting voices in [his] head," and repeatedly stated that he was "[b]lessed and highly favored."  According to Dr. Christensen, respondent would begin crying intensely without any apparent cause and, when asked to identify the goals that his hospitalization was intended to

---

[2] An Assertive Community Treatment team is "a community-based group of medical, behavioral health[,] and rehabilitation professionals who use a team approach to meet the needs of an individual with severe and persistent mental illness."  *Assertive Community Treatment*, N.C. Dep't of Health and Hum. Servs., https://www.ncdhhs.gov/divisions/mental-health-developmental-disabilities-and-substance-abuse/adult-mental-health-services/assertive-community-treatment (last visited Nov. 15, 2022).

accomplish, replied, "I don't know, 90, 40, 50 pounds probably?" and stated that he wanted to gain weight. Dr. Christensen diagnosed respondent with schizoaffective disorder and concluded that respondent was a danger both to himself and to others.

¶ 8        On 7 February 2020, the trial court held a hearing for the purpose of determining whether respondent should be released or remain in the custody of Duke for further inpatient treatment. Although an assistant public defender was present to represent respondent, no counsel appeared on behalf of the State or Duke. At the outset, respondent's trial counsel objected to proceeding with the hearing in the absence of counsel for the State or Duke, arguing that the trial court could not "on its own initiat[ive]—or volition . . . conduct the business of the State." In overruling respondent's objection, the trial court noted that, while the district attorney's office, the attorney general's office, and Duke had all declined to participate, it did not believe that it could ignore its own statutory obligation to conduct the required hearing "as a result of people failing to do their duty[.]" In addition, respondent's trial counsel unsuccessfully sought dismissal of the involuntary commitment petition on the grounds that the findings contained in the first and second commitment examination reports were nothing more than conclusory statements that did not suffice to sustain an involuntary commitment order.

¶ 9        After the completion of these preliminary proceedings, the trial court called Dr. Max Schiff, a physician who was involved in respondent's treatment, to inform the

court concerning "whether or not [he could] give [the trial court] enough evidence on this to go forward." Although respondent's trial counsel objected to the calling of Dr. Schiff as a witness on the grounds that Dr. Schiff had not performed either of the examinations that had resulted in respondent's commitment, the trial court overruled respondent's objection, explaining that, "if he doesn't know anything about this case, you can keep making your objection and we will go from there."

¶ 10        According to Dr. Schiff, respondent "has a long-standing history of mental illness with psychosis" and "currently carries a diagnosis of schizoaffective disorder, for which he's been treated since his late teens." In addition, Dr. Schiff stated that respondent's ACT team had initially brought him to the emergency room "in order to evaluate him for an acute change in his mental status with increasing disorganization, hallucinations, delusions, [and] abnormal psychomotor behavior," including reports that respondent had been "wandering around the streets" and throwing away the medication that he needed in order to remain stable. At the time that he examined respondent following the latter's arrival in the psychiatric unit, Dr. Schiff asserted that respondent "continued to demonstrate very profound disorganization of thought and behavior responding to hallucinations or internal stimuli," that it was "very difficult to elucidate a narrative from [respondent]," and that respondent claimed that "thoughts were being inserted into his head and occasionally controlling him, as well as containing derogatory content that was quite

disturbing to him." After the trial court asked for clarification about this aspect of his testimony, Dr. Schiff explained that respondent "was complaining of feeling that thoughts were being inserted into his head, that he could hear other people's thoughts or voices in his head," and that these thoughts or voices provided respondent "with derogatory content that was quite disturbing to him and made it difficult for [respondent] to attend to a normal interview."

¶ 11        According to Dr. Schiff, while respondent had been compliant with the treatment that had been provided to him at Duke, he had informed the hospital staff that he did not believe that he really needed medication or hospitalization and that he did not have any longstanding mental health problems. Dr. Schiff expressed concern that, despite respondent's improvement while under Duke's care, "if he were to be discharged, . . . there would be an immediate decompensation, given his continued level of disorganization and the hallucinations which are disturbing to him and, in the past, have led him to have aggressive behaviors in the community." In addition, Dr. Schiff informed the trial court that, during his time at Duke, respondent had "been the victim of assaults on a number of occasions as well as in the context of both his substance use and decompensated primary psychotic disorder." In response to the trial court's inquiry concerning how long Duke wished to retain respondent in involuntary commitment and what treatment plan Duke had in mind for respondent, Dr. Schiff indicated that Duke was seeking an additional thirty-day period of

involuntary commitment and that Duke would continue to administer the medications that had been provided to respondent since his arrival.

¶ 12     On cross-examination, Dr. Schiff testified that, while he had not conducted either of the evaluations that had been performed in connection with respondent's commitment or signed either of respondent's evaluations, he had attended respondent's second evaluation and currently served as respondent's attending physician. After acknowledging that respondent's ACT team would be able to assist respondent outside the hospital, Dr. Schiff pointed out that, at the time that it had brought respondent to the emergency room, respondent's ACT team had concluded that "they could no longer support him in the community based on his level of disorganization and decompensation." Dr. Schiff said he had no knowledge of any efforts that respondent might have made to harm himself but noted that "there has been some aggression and aggressive behavior before" while stating that "[respondent has] put himself in situations that would place him in danger and could place him in danger again."

¶ 13     After the completion of Dr. Schiff's testimony, respondent's trial counsel called respondent to testify. When asked if he lived with anyone, respondent replied that he lived with "[my] brother and my friend. My—he's my brother first, but he's my friend second. I was in a relationship with him for 8, 9, 10 years. But it wasn't be nothing sexually wise like that with him again." In addition, respondent testified

that, in the event that he was released, he would continue living with this man. Respondent denied having had any thoughts of self-harm or that he posed a threat to others but admitted that he sometimes got into arguments with a friend named "William," who would sometimes get angry with him. In such instances, respondent said that he would just acquiesce in whatever William wanted in order to avoid further trouble. Although respondent could not tell whether the medication that he was taking had provided him with any relief, he committed to continue to take that medication in the event that he was released. At that point, respondent had the following colloquy with his trial counsel:

> [Counsel]:   What kind of assistance or help do you have in accessing medical help?
>
> [Respondent]:      My ACT team, Easterseals.
>
> [Counsel]:   And do you cooperate with them?
>
> [Respondent]:      Easter and seals. Yes, I do, yes.
>
> [Counsel]:   And if they ask you to take medications, would you take them?
>
> [Respondent]:      Yes.
>
> [Counsel]:   And if they ask you to go see a doctor, would you go see a doctor?
>
> [Respondent]:      They have. They have tried to get me to take care of my teeth more. They wanted me to go do that, but I didn't want to do that. I just disregarded it.
>
> [Counsel]:   Why didn't you want to take care of your teeth?

> [Respondent]: I brush my teeth at least once or twice a day. You are supposed to brush it three times and have three meals. I don't get three meals a day, but they have started to give me at least breakfast, a meal for breakfast, but he's been working on losing weight, and I'm trying to work with him, but I'm gonna have to eat more.

After claiming that his mother, who lived about fifteen or twenty minutes away, would help him remember to take his medications, respondent answered his trial counsel's question concerning whether he would like to be released by stating that, "I see her ankles and Amy—the Amy at [Duke]—[Duke] remind me of my mom's ankles, and she takes her water pills in the morning. I remind her."

¶ 14 In response to questions posed by the trial court, respondent stated that he had contact with his ACT team on Mondays, Wednesdays, and Thursdays and that he attended a substance abuse group meeting on Friday "here and there, once in a blue." Respondent told the trial court that he was provided with a bus ticket every time that he went to a group meeting and that he received a weekly check from Easterseals that he used to buy groceries. Respondent answered the trial court's question concerning what had happened right before his ACT team brought him to the hospital by stating, "I don't—I don't—I was—everything was the same, you know. It's just probably one of my first family or my second family just probably wanted me there," and reiterated that he did not know why he had been taken to the hospital except "just to eat and drink."

¶ 15        In response to the trial court's questions concerning the hallucinations that Dr. Schiff had described, respondent said, "I see—I see angels, white dots. I see angels" and "they just be like, white dots, different white dots floating in the air. I see them some, like not as much. I see black dots, but I see white dots more than the white dots." Respondent said that he knew that the white dots were angels, but that "[t]he black[ ] one just might be hallucinations or—that is negativity." When the trial court asked him whether he felt better inside or outside of the hospital, respondent answered that he had "bad habits," including smoking cigarettes and marijuana, and that he would pick up cigarette butts by his apartment "so nobody can slip and fall on it."

¶ 16        After respondent's counsel made her closing argument, during which she requested that respondent be released from involuntary commitment, the trial court announced, based upon "clear, cogent, and convincing evidence," that respondent had a mental illness, that he posed a danger to himself and to others, and that he was unable to care for himself. As a result, the trial court ordered that respondent remain involuntarily committed for another thirty days. On the same date, the trial court entered a written order that incorporated the examination reports prepared by Dr. Jones and Dr. Christensen and found "by clear, cogent, and convincing evidence" that respondent

> has [a] mental illness[,] that being schizoaffective disorder
> [and] has [a] long-standing [history] of mental illness

which goes back to his late teens[,] he is 33 [years old] now. [Respondent] suffers from hallucinations, disorganized thoughts[, and] is noncompliant with medications when not in [the] hospital. His active psychosis causes him to be a danger to himself and others. His ACT team initially had him committed as they were unable to see to his needs due to his decompens[ation]. [Respondent] [is] unable to sufficiently [take] care of [his] needs[,] that being dental [and] nourishment needs. [Respondent] lives with [a] person who has anger issues [and respondent] has been [the] victim of assaultive [behavior and] disturbing thoughts which cause deterioration [and] leaves him unable to perceive dangers to himself.

Based upon these findings, the trial court concluded that respondent was mentally ill and posed a danger to himself and others. Respondent noted an appeal to the Court of Appeals from the trial court's order.

## C. Court of Appeals Decision

In seeking relief from the trial court's order before the Court of Appeals, respondent began by arguing that the trial court's written findings of fact lacked sufficient evidentiary support and did not support its conclusion that respondent posed a danger to himself and others. Among other things, respondent contended that the trial court had violated his right to confront and cross-examine the witnesses against him when it admitted the examination reports of Dr. Jones and Dr. Christensen into evidence even though neither of them had testified at the hearing and that there was "no other clear, cogent, and convincing record evidence that [respondent] was dangerous to himself or others." In addition, respondent argued

that the trial court had violated respondent's due process right to an impartial tribunal by "assuming the role of prosecutor by presenting the entirety of the State's case."

¶ 18          The Court of Appeals began by addressing respondent's due process argument, with a majority of the Court of Appeals having concluded that "the trial court only elicited evidence that would otherwise be overlooked as no counsel for the State was present," that "[t]he trial court did not ask questions meant to prejudice either party or impeach any witness," and that, as a result, "the trial court did not violate [r]espondent's right to an impartial tribunal." *C.G.*, ¶ 25. Judge Griffin dissented from his colleagues' conclusion with respect to the due process issue on the grounds that respondent had been "deprived of his liberty by an officer of the court who, after expressing some reluctance, offered and admitted evidence against that individual, called an adverse witness to testify on his adversary's behalf, and examined that witness to elicit the State's evidence." *C.G.*, ¶ 46 (Griffin, J., dissenting).[3]

¶ 19          Next, the Court of Appeals evaluated whether the trial court's written findings of fact were supported by competent evidence and supported its determination that respondent should be involuntarily committed for additional inpatient treatment. As an initial matter, the Court of Appeals held that the trial court had erred by

_____

[3] As a result of the fact that we have addressed respondent's due process claim in detail in our opinion in a companion case, we will refrain from further discussion of the Court of Appeals' evaluation of that issue in this opinion.

incorporating the commitment examination reports into its written findings of fact given that, even though such reports are generally admissible in involuntary commitment proceedings, respondent had been deprived of the right to confront and cross-examine the persons who had prepared those reports. *Id.* ¶¶ 27–28 (citing N.C.G.S. § 122C-268(f) (2019)). According to the Court of Appeals, neither Dr. Jones nor Dr. Christensen had been present at respondent's involuntary commitment hearing, so that the trial court had violated respondent's confrontation rights by incorporating the contents of those reports into its written findings of fact. *Id.* ¶ 28.[4]

Nevertheless, the Court of Appeals concluded that the testimony provided by Dr. Schiff and the trial court's remaining findings of fact were sufficient to support its decision to involuntarily commit respondent, so that the trial court's error in incorporating the examiners' reports into its findings of fact constituted harmless error. *Id.* ¶ 29 (citing *State v. Ferguson*, 145 N.C. App. 302, 307 (2001)). More

---

[4] Although Judge Griffin appeared to agree with his colleagues that the trial court had erred by incorporating the relevant reports into its written findings, he seems to have reached this conclusion on the grounds that, in light of the trial court's failure to formally admit the relevant reports into evidence, it had violated respondent's due process rights when it incorporated those reports into its written findings. *C.G.*, ¶ 54 (Griffin, J., dissenting). Judge Griffin did not, however, address the issue of whether the evidence and the trial court's written findings sufficed to support the trial court's decision to involuntarily commit respondent for additional inpatient treatment. As a result of the fact that the State did not note an appeal based upon this aspect of Judge Griffin's dissent or seek discretionary review of the Court of Appeals' decision with respect to this issue, the question of whether the Court of Appeals erred by holding that trial court improperly incorporated the contents of the examination reports into its written findings of fact is not properly before us for decision. *See* N.C. R. App. P. 10(a) (providing that issues not raised in a party's brief are deemed abandoned).

specifically, the Court of Appeals held that the record contained sufficient evidence, consisting of respondent's own testimony, to support the trial court's determination that respondent was a danger to himself because of his "inability to care for his own nourishment and dental needs." *Id.* ¶ 34. In addition, the Court of Appeals held that the trial court's finding that respondent's ACT team was unable to adequately ensure that his needs for nourishment and dental care would be met "created the [required] nexus between [r]espondent's mental illness and future harm to himself." *Id.* ¶ 35. Finally, the Court of Appeals concluded that "[a] showing of behavior that is grossly irrational, of actions that the individual is unable to control, . . . or of other evidence of severely impaired insight and judgment shall create a *prima facie inference* that the individual is unable to care for himself or herself." *Id.* ¶ 36 (quoting N.C.G.S. § 122C-3(11)(a)(1)(II) (emphasis added by Court of Appeals). In the Court of Appeals' view, Dr. Schiff's testimony concerning respondent's hallucinations and disturbed thinking, his description of the assaults that had been previously perpetrated upon respondent, and his concern that respondent would decompensate following discharge sufficed to support an inference that respondent would be unable to care for himself. *Id.* As a result, the Court of Appeals concluded that the trial court did not err by determining that respondent posed a danger to himself. *Id.*[5] Respondent

---

[5] As a result of its conclusion that the evidence supported a finding that respondent posed a danger to himself, the Court of Appeals did not reach the issue of whether the trial

noted an appeal to this Court from the Court of Appeals' decision with respect to the due process issue based on Judge Griffin's dissent, and we allowed respondent's request for discretionary review of the Court of Appeals' determination that the record evidence and the trial court's written findings sufficed to support the trial court's decision to have respondent involuntarily committed for additional inpatient treatment.

## II.    Analysis

### A. Standard of Review

According to well-established North Carolina law, this Court reviews decisions of the Court of Appeals for errors of law.  N.C. R. App. P. 16(a); *State v. Melton*, 371 N.C. 750, 756 (2018).  "When constitutional rights are implicated, the appropriate standard of review is de novo."  *In re Adoption of S.D.W.*, 367 N.C. 386, 391 (2014); *see also Dorsey v. UNC-Wilmington*, 122 N.C. App. 58, 66 (1996) (utilizing a de novo standard of review in determining whether the trial court had violated a party's due process right to an "impartial decisionmaker").  In addition, as the Court of Appeals has correctly held, an involuntary commitment order is reviewed on appeal for the purpose of determining whether the trial court's findings of fact are supported by sufficient evidence and whether the trial court's findings support its determination

---

court's determination that respondent posed a danger to others had sufficient support in the record evidence and the trial court's findings of fact.  *C.G.*, ¶ 33.

that the respondent should be involuntarily committed for additional inpatient treatment, *In re N.U.*, 270 N.C. App. 427, 430 (2020), with the latter of these determinations also being subject to de novo review on appeal. "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33 (2008) (cleaned up). Although the involuntary commitment order at issue in this case has long since expired, respondent's appeal is not moot. *See In re E.D.*, 372 N.C. 111, 114 n.8 (2019) (concluding that "[t]he possibility that [the] respondent's commitment in this case might likewise form the basis for a future commitment, along with other obvious collateral consequences, convinces us that this appeal is not moot" (quoting *In re Hatley*, 291 N.C. 693, 695 (1977))).

**B. Due Process**

In his first challenge to the Court of Appeals' decision, respondent argues that the trial court violated his due process right to an impartial tribunal when it "called the case, elicited all the evidence in favor of involuntarily committing [respondent], and then, based on the evidence [that] the [trial court] introduced, decided to involuntarily commit [respondent]." For the reasons set forth in our opinion in *In re J.R.*, ___ N.C. ___, 2022-NCSC-127, we hold that no due process violation occurred in this case given that nothing about the manner in which the trial court conducted respondent's involuntary commitment hearing tended to cast doubt upon the trial

court's impartiality. "The trial court simply presided over the hearing, asking questions to increase understanding and illuminate relevant facts to determine whether respondent met the necessary conditions for commitment." *Id.* ¶ 24. As a result, we affirm the decision of Court of Appeals with respect to the due process issue.

## C. Sufficiency of Written Findings Supporting Commitment

¶ 23    In his second challenge to the trial court's involuntary commitment order, respondent argues that the trial court's findings of fact were not supported by competent evidence and that those findings were not sufficient to support a determination that respondent posed a danger to himself. As we have already noted, in order to involuntarily commit an individual for inpatient treatment, the trial court must "find by clear, cogent, and convincing evidence that the respondent is mentally ill" and that he or she is either "dangerous to self" or "dangerous to others." N.C.G.S. § 122C-268(j).[6] A respondent poses a danger to himself when, "[w]ithin the relevant past," he or she has (1) acted in a manner that presents a reasonable probability that

---

[6] As a result of the fact that respondent has not contested the validity of the trial court's finding that he was mentally ill, that determination is binding for purposes of appellate review. *See State v. Fuller*, 376 N.C. 862, 2021-NCSC-20, ¶ 8 (holding that "[a] trial court's finding of an ultimate fact is conclusive on appeal if the evidentiary facts reasonably support the trial court's ultimate finding"). In addition, we conclude that the trial court's determination concerning respondent's mental illness is supported by Dr. Schiff's testimony that respondent suffers from a schizoaffective disorder and has a "long-standing history of mental illness with psychosis" and by respondent's admission that he had been diagnosed with a mental illness.

he or she will suffer serious physical debilitation in the near future; (2) attempted or threatened suicide and there is a reasonable probability of suicide; or (3) mutilated or attempted to mutilate himself or herself and there is a reasonable probability of serious self-mutilation, absent intervention and treatment. N.C.G.S. § 122C-3(11)(a). With respect to the first of these three scenarios, which is the only one that appears to be relevant for purposes of this case, the relevant statute provides that an individual poses a danger to himself if:

> I.     The individual would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations, or to satisfy the individual's need for nourishment, personal or medical care, shelter, or self-protection and safety.

> II.     There is a reasonable probability of the individual's suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself or herself.

N.C.G.S. § 122C-3(11)(a)(1). In addition, the relevant statutory language provides that "previous episodes of dangerousness to self, when applicable, may be considered when determining reasonable probability of physical debilitation, suicide, or self-mutilation." N.C.G.S. § 122C-3(11)(a). A trial court must make findings of fact that

support both prongs of this test in order to support an involuntary commitment order. N.C.G.S. § 122C-268(j).

In seeking to persuade us to overturn the trial court's involuntary commitment order, respondent argues that the Court of Appeals' decision in this case "dramatically changed the test for what constitutes 'danger to self' " by "essentially [holding] that a person may be found to be dangerous to himself based solely on current self-care issues without any forward-facing showing of 'serious physical debilitation.' " According to respondent, the trial court was required to make specific findings concerning the probability that respondent would experience serious physical debilitation if released given that the Court of Appeals has previously held that "courts may not disregard the second prong of the definition of 'danger to self,' " citing *In re Monroe*, 49 N.C. App. 23, 29 (1980), *superseded on other grounds by statute,* An Act to Recodify the Mental Health, Mental Retardation, and Substance Abuse Laws of North Carolina, ch. 589, §§ 1–2, 1985 N.C. Sess. Laws 670, 672, *as recognized in In re J.P.S.*, 264 N.C. App. 58 (2019); *In re W.R.D.*, 248 N.C. App. 512, 516 (2016); *In re Whatley*, 224 N.C. App. 267, 273 (2012). In respondent's view, "[u]nder *Monroe, Whatley, W.R.D.*, and the plain language of the involuntary commitment statutes, being mentally ill and exhibiting symptoms of that mental illness, without more, are insufficient to support a finding of dangerous to self."

¶ 25   According to respondent, "none of the trial court's findings specifically addressed the future harm prong" of the statute.  In addition, respondent contends that the record contains insufficient record evidence to support the trial court's order, with the Court of Appeals having erred by relying on Dr. Schiff's testimony that respondent "was still experiencing symptoms of his mental illness and that [respondent] told [Dr. Schiff] that he didn't think he needed his medication or had a long-standing mental illness," citing *C.G.*, ¶ 36.  In respondent's view, "this evidence reflected the trial court's ultimate finding that [respondent] had a mental illness and described [respondent's] condition and symptoms at the time of the hearing, [but it does] not indicate that [respondent] presented a threat of 'serious physical debilitation' in the near future."

¶ 26   Finally, respondent argues that a "prima facie inference" that he lacked the ability to care for himself, which the trial court was entitled to make in the event that respondent displayed certain behaviors or actions, *see* N.C.G.S. § 122C-3(11)(a)(1)(II), did not relieve the trial court of its obligation to make a finding that respondent would have likely experienced serious physical debilitation in the event that he was not involuntarily committed.  Respondent argues that a person's inability to take care of his or her daily needs is not equivalent to facing a reasonable possibility that he or she would sustain serious harm and that the Court of Appeals' conclusion to the contrary "erodes the constitutional assurance that we don't involuntarily commit

someone for having a mental illness," citing *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975). As a result, for all these reasons, respondent urges us to reverse the Court of Appeals' holding that the trial court's findings of fact sufficed to support its determination that he posed a danger to himself.

¶ 27 In seeking to persuade us to uphold the trial court's order, the State begins by arguing that respondent "does not contest the [trial] court's finding that he was not able to satisfy his basic needs and exercise self-control" and that, even if he had done so, those findings had sufficient record support. In addition, the State contends that the trial court "properly found that there was a reasonable probability of [respondent's] physical debilitation in the near future absent treatment." After acknowledging that the trial court is required to find that respondent would likely suffer physical debilitation in the near future in the event that he was released from involuntary commitment, the State argues that the trial court "need not say the magic words 'reasonable probability of future harm' " in order to make the required determination, quoting *J.P.S.*, 264 N.C. App. at 63.

¶ 28 According to the State, the trial court "specifically found that [respondent's] current psychosis will persist and endanger him in the near future" and "that [he] was likely to repeat his previous self-endangering conduct." First, the State contends that the trial court found that respondent had " '*active* psychosis' " that " 'causes him to be a danger to himself and others' " and that, "unless committed, [respondent] was

likely to continue to experience self-endangering psychosis, hallucinations, and disorganized thoughts." (emphasis added in brief). In addition, the State argues that the trial court found that respondent "was noncompliant with his medicine when he was not in inpatient treatment," a fact that "indicate[s] that, if released, there was a reasonable probability that the symptoms causing [respondent's] physical debilitation would continue." The State contends that these findings are supported by Dr. Schiff's testimony that respondent had "very profound disorganization of thought and behavior responding to hallucinations," that his thoughts "contain[ed] derogatory content that was quite disturbing to [respondent]," and that respondent had thrown away his medications.

¶ 29          Second, the State argues that the trial court "made findings that indicate that, absent treatment, [respondent] was likely to engage in conduct that had harmed him in the past." More specifically, the State asserts that the trial court found that "[respondent] lives with a person who has anger issues . . . and that [he] has, in fact, become a victim of assaultive behavior and disturbing thoughts, which caused deterioration and leaves him unable to perceive dangers to himself *resulting in his being assaulted.*" (emphasis added in brief). According to the State, these findings "indicate that, absent treatment, [respondent's] disturbing thoughts would have persisted and there was a reasonable probability that [respondent] would both behave in ways that instigated others to violence and been unable to perceive the danger of

being assaulted" given that respondent "lived with a roommate who struggled with anger management and with whom [respondent] had previously gotten into fights, and because, before he was committed, [respondent] had started wandering the streets."

¶ 30   Finally, the State argues that "the inference that [respondent] was unable to care for himself provides further support for the conclusion that there was a reasonable probability that [respondent] would suffer serious physical debilitation absent treatment," citing N.C.G.S. § 122C-3(11)(a)(1)(II).  In the State's view, respondent's behavior warrants such an inference in light of the trial court's finding that respondent "suffers from hallucinations" and "disorganized thoughts" and the testimony presented at the hearing both by Dr. Schiff and by respondent.  In addition, the State argues that the trial court's other findings, including its determination that respondent's ACT team had been unable to care for him, "combined with the inference that [respondent] was unable to care for himself, further indicate that [respondent] was likely to suffer physical debilitation in the near future."

¶ 31   After carefully reviewing the record, we hold that the trial court's written findings were insufficient to support its ultimate finding that respondent constituted a danger to himself.  As we have already noted, the involuntary commitment statutes provide that "the court *shall* find by clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self." N.C.G.S. § 122C-268(j) (emphasis

added).  For that reason, the required finding "must actually be made by the trial court" and "cannot simply be inferred from the record."  *State v. Morgan*, 372 N.C. 609, 616 (2019) (holding that, "when the General Assembly has inserted the phrase 'the court finds' in a statute setting out the exclusive circumstances under which a defendant's probation may be revoked, the specific finding described in the statute must actually be made by the trial court and cannot simply be inferred from the record").  However, "[t]hese ultimate findings, standing alone, are insufficient to support the trial court's order," since "the trial court must also 'record the facts upon which its ultimate findings are based.' "  *In re N.U.*, 270 N.C. App. at 430 (quoting *In re Collins*, 49 N.C. App. 243, 246 (1980)).  As a result, our review of the sufficiency of the trial court's order in this case must begin with an examination of its written findings.

¶ 32        As we have already noted, the trial court found in its written order that

> Respondent has [a] mental illness[,] that being schizoaffective disorder [and] has [a] long-standing [history] of mental illness which goes back to his late teens[,] he is 33 [years old] now. [Respondent] suffers from hallucinations, disorganized thoughts[, and] is noncompliant with medications when not in [the] hospital. His active psychosis causes him to be a danger to himself and others.  His ACT team initially had him committed as they were unable to see to his needs due to his decompens[ation]. [Respondent is] unable to sufficiently [take] care of [his] needs[,] that being dental [and] nourishment needs.  [Respondent] lives with [a] person who has anger issues [and respondent] has been [the] victim of assaultive [behavior and] disturbing thoughts

> which cause deterioration [and] leaves him unable to perceive dangers to himself.

As an initial matter, we observe that, contrary to the State's assertion, the trial court never found that "[respondent] was unable to satisfy his basic needs and exercise self-control." On the contrary, the trial court found that respondent could not take care of his "dental" and "nourishment" needs, rather than his "basic" needs, and said nothing about respondent's ability to exercise self-control. In addition, we note that the trial court did not find that, in the event that respondent was released from involuntary commitment, he would immediately decompensate or place himself in danger or that respondent's ACT team could not manage respondent's level of functioning in an outpatient environment. As a result, under the applicable legal standard, we are required to take the trial court's findings as they stand without reference to any other information that might be contained in the record, including Dr. Schiff's testimony that "there would be an immediate decompensation" upon discharge; that, in the absence of inpatient treatment, respondent "would immediately decompensate, be into a hospital," or "into a situation placing himself or others in danger;" and that respondent's ACT team could not support respondent in an outpatient environment.

¶ 33     The trial court's findings, as written, cannot be deemed sufficient to support a determination that respondent posed a danger to himself given its failure to find that there was "a reasonable probability of [respondent] suffering serious physical

debilitation within the near future" unless he was involuntarily committed. N.C.G.S. § 122C-3(11)(a)(1)(II). As the Court of Appeals has consistently held for several decades, the relevant statutory provision "mandates a specific finding of a probability of serious physical debilitation resulting from the more general finding of lack of self-caring ability." *Monroe*, 49 N.C. App. at 29; *see also W.R.D.*, 248 N.C. App. at 515 (holding that, in order to support a determination that the respondent posed a danger to himself, the trial court must find that the respondent cannot care for himself or herself *and* that there is a reasonable probability that the respondent will experience serious physical debilitation in the absence of continued inpatient treatment); *Whatley*, 224 N.C. App. at 273 (holding that "the trial court's findings reflect [the] [r]espondent's mental illness, but they do not indicate that [her] illness or any of her aforementioned symptoms will persist and endanger her within the near future").

¶ 34    In *Monroe*, the respondent's brother sought to have the respondent involuntarily committed on the grounds that he posed a danger to himself and others. 49 N.C. App. at 24. At the conclusion of the involuntary commitment hearing, the trial court determined that respondent was mentally ill and a danger to himself and others[7] based upon the following findings of fact:

_____

[7] The statutory definition of "dangerous to self" at the time that the Court of Appeals decided *Monroe* was, for all relevant purposes, identical to the one that applies in this case. *Compare* N.C.G.S. 122-58.2(1) (1979) *with* N.C.G.S. 122C-3(11)(a) (2021).

1.      The Respondent has been hospitalized at Dorothea Dix Hospital two times since 1975 prior to his current admission.

2.      At the time of his last discharge from the hospital the Respondent's physician prescribed medicine for him to take, and his brother purchased the medicine for him.  The Respondent took the medicine for only three weeks.  The Respondent then refused to take any more of his medicine and stated to his brother, "You might as well give me the money because I will not take that.  I don't need it."

3.      As long as Respondent was taking his medicine he was in control of himself; but, once he stopped taking his medicine he started going down.

4.      He has become uncontrollable at times.

        a.      During the night he is irregular in his sleeping. He is up from three to six times a night.

        b.      At other times he is in his front yard or on his porch making all kinds of loud noises or calling inappropriately to anyone passing by and telling them to hold their head up or telling them how they should do.

. . . .

5.      Respondent disregards his nutritional needs by fasting for some periods and then eating a whole chicken or a whole loaf of bread.  Respondent eats about five pounds of sugar every two days.  He will sometimes consume five or six glasses of sweet water.

. . . .

8.      Respondent has the paranoid and delusional belief that his family is sexually seducing him and he has accused them of that.  He believes that all of his relatives are against him.

9. On a previous hospital admission, Respondent was noted to be lying in bed all day staring up at the ceiling. He wouldn't move. This same type of behavior has been exhibited on his present admission.

10. Respondent has refused medication on this admission.

*Id*. at 26–27. On appeal, the Court of Appeals held that "neither the facts recorded by the trial court nor the record supports a conclusion or ultimate finding of dangerousness to self" on the basis that, "even if indicative of some danger, the facts do not support the finding that there is a reasonable probability of serious physical debilitation to the [r]espondent within the near future." *Id*. at 29 (cleaned up). The Court of Appeals also noted that, while the respondent's disregard of his nutritional needs "may be evidence of mental illness" or even characteristic of an "inability to 'exercise self-control, judgment, and discretion in the conduct of his daily responsibilities,' " the record evidence did not show a "reasonable probability of serious physical debilitation to [the respondent] within the near future," with the State having failed to elicit any evidence "showing the present or future effect of these irregular dietary habits on respondent" and with the existence of "[u]nusual eating habits alone [ ] do not amount[ing] to danger as contemplated in the controlling statute." *Id*. (quoting N.C.G.S. 122-58.2(1)(a)(1)(I) (1979))

¶ 35        In *Whatley*, the trial court involuntarily committed the respondent for additional treatment after finding "by clear, cogent, and convincing evidence" that she

> was exhibiting psychotic behavior that endangered her and her newborn child. She is bipolar and was experiencing a manic stage. She was initially noncompliant in taking her medications but has been compliant over the past 7 days. Respondent continues to exhibit disorganized thinking that causes her not to be able to properly care for herself. She continues to need medication monitoring. Respondent has been previously involuntarily committed.

224 N.C. App. at 271. On appeal, the Court of Appeals held that "none of the [trial] court's findings demonstrate that there was 'a reasonable possibility of [the respondent] suffering serious physical debilitation within the near future' absent her commitment" and that, while "[e]ach of the trial court's findings pertain to either [the] [r]espondent's history of mental illness or her behavior prior to and leading up to the commitment hearing," they "do not indicate that these circumstances rendered [the] [r]espondent a danger to herself in the future." *Id.* at 273. In addition, the Court of Appeals held that, even though the trial court had determined that the respondent "needed medication monitoring and that she did not plan to follow up as an outpatient," the trial court had made "no finding that connect[ed] these concerns with the court's ultimate finding of 'dangerous to self' as defined in [N.C.G.S.] § 122C-3(11)(a)(1)." *Id.*

¶ 36        In *W.R.D.*, the Court of Appeals determined that the trial court's involuntary commitment order contained only two findings that could reasonably be construed as relevant to the issue of whether the respondent posed a "danger to self." 248 N.C. App. at 515.

> First, the trial court found that "it is not medically safe for Respondent to live outside of an inpatient commitment setting" because "Respondent maintains a belief that another doctor is his treating physician and will not be treated by Dr. Weigel"; "Respondent is diagnosed with paranoid schizophrenia, for which Respondent has refused treatment"; and "Respondent has heart health related issues, for which he is not compliant with prescribed medical treatment." Second, the trial court found that Respondent was "unable to take [sic] maintain his nutrition." The trial court did not include any additional findings of fact concerning Respondent's nutrition.

*Id*. at 515–16. After concluding that the record did not contain any evidence tending to show that the respondent's "refusal to acknowledge his mental illness" or his "refusal to take his prescription medication" created a "reasonable probability of his suffering serious physical debilitation within the near future" in the absence of immediate involuntary commitment, the Court of Appeals determined that the trial court's findings with respect to the respondent's "inability to 'maintain his nutrition' [were] not supported by competent evidence." *Id*. at 516.

¶ 37     Most recently, in *J.P.S.*, the Court of Appeals vacated an involuntary commitment order in which the trial court had found that the respondent posed a danger to himself based on evidence tending to show that

> (1) Respondent maintained grandiose thoughts that he had a military staff providing him with intelligence information; (2) Respondent ingested a large number of pills in an apparent suicide attempt; (3) Respondent had "a high dose of Adderall [and] Valium meds"; (4) Respondent presented with an agitated manner and required forced medication and restraints; (5) Respondent refused medication for mania and psychosis; and (6) Respondent suffered from post-traumatic stress disorder as a result of prior military service.

264 N.C. App. at 63. In declining to uphold the trial court's involuntary commitment order "because of the trial court's failure to include a finding of reasonable probability of some future harm," the Court of Appeals explained that, "[a]s in *Whatley*, the trial court's findings in this case 'reflect [the] [r]espondent's mental illness, but they do not indicate that [the] [r]espondent's illness or any of [his] aforementioned symptoms will persist and endanger [him] within the near future.'" *Id.* (quoting *Whatley*, 224 N.C. App. at 273). According to the Court of Appeals, while "the trial court need not say the magic words 'reasonable probability of future harm,' *it must draw a nexus between past conduct and future danger.*" *Id.* (emphasis added) (quoting *Whatley*, 224 N.C. App. at 273).

¶ 38     The consistent theme in each of these decisions is that trial court's findings that an individual suffers from a mental illness, exhibits symptoms associated with

that mental illness, and may not be able to take care of his or her needs are not sufficient to satisfy the second prong of the statutory test for the presence of a "danger to self." In this case, the trial court found that respondent suffered from schizoaffective disorder, hallucinations, and disorganized thoughts; that his ACT team had initially had respondent committed because "they were unable to see to his needs due to his decompensating;" that he was "noncompliant with medications" when he was not in the hospital; and that he was not able to sufficiently attend to his "dental [and] nourishment needs." A critical analysis of these findings and the underlying record evidence shows that they "[do] not demonstrate a 'reasonable probability of [respondent] suffering serious physical debilitation within the near future' without immediate, involuntary commitment," *W.R.D.*, 248 N.C. App. at 516, with the trial court having failed to couple its findings concerning respondent's past and current condition with any findings regarding the extent to which respondent faced a risk of "serious physical debilitation" in the event that he did not remain in inpatient care.

¶ 39        In seeking to persuade us to reach a different result, the State contends that the trial court's findings "show that [respondent's] symptoms were likely to persist" given that those findings use "present tense verbs" to describe respondent's symptoms and indicate that respondent "has an *active* psychosis' that makes him 'a danger to himself.' " (emphasis added in brief). We do not find this argument persuasive. As

an initial matter, the trial court findings in each of the Court of Appeals' decisions described above were also written in the present tense, but that fact did not convince the Court of Appeals to uphold the challenged orders. In addition, and more importantly, the fact that a respondent had significant mental health difficulties in the past and currently exhibits symptoms of mental illness, standing alone, does not tend to establish that these symptoms will necessarily occur or persist in the future or that he or she will suffer serious physical debilitation in the near future in the absence of additional inpatient treatment. *See J.P.S.*, 264 N.C. App. at 62 (stating that "[a] trial court's involuntary commitment of a person cannot be based solely on findings of the individual's 'history of mental illness or . . . behavior prior to and leading up to the commitment hearing' " (quoting *Whatley*, 224 N.C. App. at 273)).[8] In addition, the trial court's finding that respondent's "active psychosis causes him to be a danger to himself" fails to explain how respondent's psychosis precludes him from attending to his physical needs or causes him to face a risk of serious physical debilitation in the near future. Simply put, findings or evidence that one has been or

---

[8] The State relies on *Carr v. United States*, 560 U.S. 438, 448 (2010), for the proposition that "words used in the present tense include the future as well as the present." *Carr* involved the interpretation of a federal sex offender registration statute, with the quoted language having come directly from 1 U.S.C. § 1, which provides guidance for "determining the meaning of any Act of Congress." *Id.* We are unable to see how *Carr* has any relevance to the issue that is before us in this case, which involves the interpretation of a state court's handwritten factual findings contained in an involuntary commitment order.

currently is mentally ill, or has, in the past, "decompensat[ed],"[9] without more, does not make one dangerous to himself or others, with the trial court's findings to that effect and the underlying record evidence failing to account for the fact that the second prong of the relevant statutory test requires proof that future physical harm is probable in the absence of involuntary commitment. *See O'Connor*, 422 U.S. at 575 (holding that "[a] finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement").[10]

¶ 40    We are equally unpersuaded by the State's claim that respondent's involuntary commitment was justified by the trial court's finding that respondent lived with a roommate who had anger problems and that respondent had previously been assaulted by others. As respondent points out, these facts "[do] not justify *his*

---

[9] In our understanding, "decompensation" is a term of art within the psychiatric profession that Dr. Schiff never defined during his testimony. Although the American Psychological Association defines "decompensation" as "a breakdown in an individual's defense mechanisms, resulting in a progressive loss of normal functioning or worsening of psychiatric symptoms," *American Psychological Association Dictionary of Psychology*, https://dictionary.apa.org/ decompensation (last visited December 6, 2022), neither the trial court's order nor Dr. Schiff's testimony demonstrates specifically how a likelihood of "decompensation" tended to show the existence of a "reasonable probability of [respondent] suffering serious physical debilitation within the near future" absent treatment in an inpatient facility.

[10] More specifically, while the record does contain evidence tending to show that respondent suffered from active psychosis, was at a risk of decompensation, and had shown a level of decompensation in the recent past, that generalized evidence, without more, does not tend to show that respondent is at a risk of substantial debilitation in the near term in the event that he is released from involuntary commitment.

commitment" against his will, with the Court of Appeals having rejected a virtually

identical argument more than forty years ago in the course of considering the

sufficiency of psychiatric testimony that the respondent "was imminently dangerous

to herself and others" because the respondent's mental health difficulties might cause

others to engage in assaultive behavior. *See In re Hogan*, 32 N.C. App. 429, 434

(1977). As the Court explained,

> it is abundantly clear from his testimony given at the
> hearing that [the psychiatrist] arrived at his opinion that
> [the] respondent was imminently dangerous to herself or
> others solely because he felt that her persistence in trying
> to convert someone on the street might cause that person
> to resist the idea, so that "they could become physically
> aggressive toward her." If so, it would seem more
> appropriate to commit her aggressor rather than the
> respondent.

*Id.*; *see also Monroe*, 49 N.C. App. at 29–30 (holding that "[t]he chance that someone

will harm [the] respondent in response to [his] action[s] cannot be found to be

evidence of danger to self"). As a result, we hold that a risk that someone else might

engage in unlawful conduct by assaulting respondent cannot support a determination

that respondent poses a danger to himself sufficient to support the respondent's

involuntary commitment for inpatient mental health treatment.

¶ 41        Finally, the State argues that "the inference that [respondent] was unable to

care for himself provides further support for the conclusion that there was a

reasonable probability that [respondent] would suffer serious physical debilitation

absent treatment," citing N.C.G.S. § 122C-3(11)(a)(1)(II). Admittedly, the record in this case could support a determination of "grossly irrational" or "grossly inappropriate" behavior on the part of respondent and contains "other evidence of impaired insight and judgment" on respondent's part that is sufficient to "create a prima facie inference that [respondent] is unable to care for himself."[11] N.C.G.S. § 122C-3(11)(a)(1)(II). As the State acknowledges, however, "an inference that respondents are unable to care for themselves cannot alone satisfy the second prong" of the statutory definition of "danger to self." In addition, as we have already explained, an inference that someone is "unable to care for himself" does not necessarily mean that that person is at risk of "suffering serious physical debilitation within the near future" in the absence of inpatient mental health treatment, with the fact that the respondent is "unable to care for himself" being insufficient to obviate the need to "draw a nexus between [the respondent's] past conduct and future danger." *J.P.S.*, 264 N.C. App. at 63.

¶ 42        Thus, for all these reasons, we hold that the Court of Appeals erred by concluding that the trial court's findings and the record evidence were sufficient to support a determination that respondent posed a danger to himself and that

---

[11] Interestingly, it was the Court of Appeals that first drew this inference. There is no indication in the record that the trial court did so.

respondent's involuntary commitment could be justified on that basis. [12] As a result, we reverse the trial court's involuntary commitment order and remand this case to the trial court for further proceedings not inconsistent with this opinion.[13] We take this action with the understanding that, as the Court of Appeals observed in *W.R.D.*,

---

[12] An examination of the sufficiency of the evidence concerning the extent to which respondent posed a danger to himself is necessary in order to permit the Court to determine whether this case should be remanded to the trial court for the purpose of allowing the trial court to consider whether, in the event that the trial court had made proper findings of fact that were supported by the evidence, respondent should have been involuntarily committed.

[13] Although the trial court also found that respondent was a danger to others, the Court of Appeals did not review the sufficiency of this finding or whether the evidence supported it in light of its determination that the trial court had properly found that respondent posed a danger to himself. *C.G.*, ¶ 33. Although the State made a relatively brief argument in the Court of Appeals that the trial court's findings and the record evidence would have supported a determination that respondent posed a danger to others, it made no effort to present any such argument before this Court and has not requested that, in the event that we did not uphold the trial court's involuntary commitment order on the grounds that respondent posed a danger to himself, we remand this case to the Court of Appeals for the purpose of allowing it to determine whether the trial court's involuntary commitment order could be upheld on the basis that respondent posed a risk to others. Aside from the issue of whether the remand approach remains viable as a matter of appellate procedure, we note that the relevant statute provides that a respondent is "dangerous to others" if, "[w]ithin the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated." N.C.G.S. § 122C-3(11)(b). The trial court made no written findings that tend to suggest that respondent's conduct would satisfy this statutory definition, and nothing in the record evidence appears to us to be sufficient to support such a determination. Dr. Schiff's assertion that respondent's hallucinations have in the past "led him to have aggressive behaviors in the community," without explaining what those behaviors were, and respondent's vague statement that he and William had "gotten into it" are hardly "clear, cogent, and convincing evidence" of the infliction, attempted infliction, threatened infliction, or creation of a substantial risk of "serious bodily harm on another." As a result, we decline to remand this case to the Court of Appeals for consideration of the extent to which, if at all, the trial court's involuntary commitment order should be upheld on the basis of a determination that respondent posed a danger to others.

our decision "does not mean that [r]espondent is competent, or that he cannot properly be committed at some future hearing." 248 N.C. App. at 513. Instead, "[w]e simply hold that the trial court's findings and the evidence in the record are insufficient to satisfy the statutory criteria for involuntary commitment," *id.*, with a firm adherence to the relevant statutory requirements in these cases being essential given the "massive curtailment of liberty" and "stigmatizing consequences" that accompany involuntary commitment. *Vitek v. Jones*, 445 U.S. 480, 491–92 (1980).

### III.  Conclusion

Thus, for the reasons set forth in *In re J.R.*, ___ N.C. ___, 2022-NCSC-127, we affirm the Court of Appeals' decision with respect to the due process issue while holding that the record evidence and the trial court's written findings of fact do not suffice to support the trial court's involuntary commitment order. As a result, we reverse the Court of Appeals' decision, in part, and remand this case to that Court for further remand to the District Court, Durham County, for further proceedings not inconsistent with this opinion.

AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED.

Chief Justice NEWBY concurring in part and dissenting in part.

I agree with the majority's conclusion that respondent's due process right to an impartial tribunal was not violated for the reasons stated in *In re J.R.*, 2022-NCSC-127. I write separately, however, because the trial court did make forward-looking findings of fact that draw a nexus between respondent's past conduct and a reasonable probability of future harm. Because the trial court's findings of fact are supported by competent evidence and are sufficient to indicate a reasonable probability of respondent suffering future harm without adequate treatment, the Involuntary Commitment Order should be affirmed. Accordingly, I respectfully concur in part and dissent in part.

On 30 January 2020, respondent was taken to the emergency department by his outpatient care team, the Assertive Community Treatment (ACT) team. An ACT team consists of various mental health care providers who assist respondent when he is not in the hospital and monitor him weekly to ensure that he is taking his medication and that his dental and nourishment needs are met. Phillip Jones, M.D. first examined respondent when he arrived at the hospital and reported that respondent was "so psychotic [that] he [was] unable to effectively communicate his symptoms." Dr. Jones completed a commitment report, concluding that respondent was dangerous to himself, and petitioned for respondent's involuntary commitment. The next day, Miles Christensen, M.D. conducted a second examination of respondent

and completed a second commitment report. He observed that respondent was hearing voices, experiencing hallucinations, and "crying intensely." Dr. Christensen diagnosed respondent with schizoaffective disorder and recommended that respondent be committed.

¶ 46 The trial court held an involuntary commitment hearing on 7 February 2020. Max Schiff, M.D., respondent's attending physician, testified. Dr. Schiff explained that respondent's ACT team brought respondent to the hospital because the team "could no longer support him in the community" as an outpatient due to "an acute change in his mental status with increasing disorganization, hallucinations, delusions, abnormal psychomotor behavior, . . . [and] wandering around the streets." Dr. Schiff described that respondent was still demonstrating "very profound disorganization of thought and behavior responding to hallucinations" during his evaluation of respondent. According to Dr. Schiff, respondent had not taken his medications, "which had previously stabilized him[,]" and respondent informed him that "thoughts were being inserted into his head and [were] occasionally controlling him." Dr. Schiff expressed concern that, if respondent was discharged, he "would immediately decompensate . . . into a situation placing himself or others [in] danger."

¶ 47 Respondent also testified at the hearing. Respondent explained that he sees black dots and angels, which he described as white dots. Respondent stated that he had been taking his medication and would continue to do so, but he could not "tell a

difference" if the medication was helping him.

At the close of the hearing, the trial court concluded that respondent was mentally ill and a danger to himself and others. The trial court recorded the following findings of fact:

> Respondent has [a] mental illness that being schizoaffective [disorder and] has long[-]standing [history] of mental illness which goes back to his late teens[.] [H]e is 33 [years old] now. Resp[ondent] suffers from hallucinations, disorganized thoughts[, and] is noncompliant with medications when not in [the] hospital. His active psychosis causes him to be a danger to himself and others. His ACT team initially had him committed as they were unable to see to his needs due to his decompensating [and] unable to sufficiently take care of needs that being dental [and] nourishment needs. [Respondent] lives with [a] person who has anger issues [and respondent] has been [a] victim of assaultive [behavior and] disturbing thoughts which cause deterioration [and] leaves [respondent] unable to perceive dangers to himself.

The trial court ordered that respondent be involuntarily committed for thirty days. Respondent appealed.

On appeal, respondent challenged the trial court's conclusion that he was a danger to himself or others under N.C.G.S. § 122C-3(11)(a). The Court of Appeals concluded that the "trial court properly found Respondent was a danger to himself."[1] *In re C.G.*, 278 N.C. App. 416, 2021-NCCOA-344, ¶ 33. The Court of Appeals reasoned

---

[1] Accordingly, the Court of Appeals did not reach the issue of whether the trial court's conclusion that respondent is a danger to others was supported by sufficient evidence.

that the finding that respondent's ACT team was unable to care for his dental and nourishment needs "created the nexus between Respondent's mental illness and future harm to himself." *Id.* ¶ 35. Therefore, according to the Court of Appeals, "the trial court satisfied the requirement [that] it find a reasonable probability of future harm absent treatment." *Id.* The Court of Appeals thus affirmed the commitment order. *Id.* ¶ 37.

¶ 51        Respondent petitioned this Court to consider whether the Court of Appeals erred in concluding that the trial court's written findings of fact were supported by competent evidence and were sufficient to support its conclusion that respondent is dangerous to himself. This Court allowed respondent's petition.[2]

¶ 52        The task here is to determine whether the Court of Appeals properly held that the trial court's findings of fact were supported by competent evidence and, in turn, supported its conclusion that respondent is a danger to himself. This Court reviews decisions of the Court of Appeals for legal error. *State v. Brooks*, 337 N.C. 132, 149, 446 S.E.2d 579, 590 (1994). Appellate review of a commitment order "is limited to determining '(1) whether the court's ultimate findings are indeed supported by the "facts" which the court recorded in its order as supporting its findings, and (2) whether in any event there was competent evidence to support the court's findings.' "

---

[2] Respondent also appealed to this Court as of right based upon the dissenting opinion at the Court of Appeals, regarding the due process issue. Because the due process issue was resolved based upon the holding in the lead case, that issue is not further discussed herein.

*In re Moore*, 234 N.C. App. 37, 42–43, 758 S.E.2d 33, 37 (quoting *In re Hogan*, 32 N.C. App. 429, 433, 232 S.E.2d 492, 494 (1977)), *disc. rev. denied*, 367 N.C. 527, 762 S.E.2d 202 (2014).

¶ 53 "To support an inpatient commitment order, the court shall find by clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self . . . or dangerous to others . . . ." N.C.G.S. § 122C-268(j) (2021). An individual is a danger to himself if he has acted in a way that shows all of the following:

> I. The individual would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations, or to satisfy the individual's need for nourishment, personal or medical care, shelter, or self-protection and safety.
>
> II. There is a reasonable probability of the individual's suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself or herself.

N.C.G.S. § 122C-3(11)(a)(1) (2021).

¶ 54 Thus, the trial court must make findings that address both respondent's current inability to care for himself and the probability that respondent would suffer serious physical debilitation in the future without treatment.

¶ 55    Specifically at issue here is whether the trial court made forward-looking findings sufficient to support a reasonable probability of respondent suffering serious harm in the future without adequate treatment. To satisfy this prong, the trial court's findings must simply "*indicate* that respondent is a danger to himself in the future." *See In re Moore*, 234 N.C. App. at 44–45, 758 S.E.2d at 38 (emphasis added). The trial court "must draw a nexus between past conduct and future danger"; however, it "need not say the magic words 'reasonable probability of future harm.'" *In re J.P.S.*, 264 N.C. App. 58, 63, 823 S.E.2d 917, 921 (2019) (citing *In re Whatley*, 224 N.C. App. 267, 273, 736 S.E.2d 527, 531 (2012)).

¶ 56    The majority contends the trial court's findings of fact are insufficient to support the conclusion that respondent is dangerous to himself. According to the majority, the trial court's findings do not indicate a reasonable probability of respondent suffering serious physical debilitation in the future. Rather, the majority contends the trial court's findings focus on respondent's behavior prior to the commitment hearing and fail to draw a nexus to a risk of future harm.

¶ 57    Here the trial court did make findings about respondent's likely future conduct and risk of harm without adequate treatment. The trial court found that respondent "*suffers* from hallucinations [and] disorganized thoughts" and has "*active* psychosis"

which "*causes* him to be a danger to himself."[3] The trial court's findings thus indicate that respondent poses a danger to himself by drawing a nexus between respondent's present symptoms—hallucinations, disorganized thoughts, and active psychosis—and the risk of dangerousness if the symptoms remained untreated.

¶ 58  Dr. Schiff provided forward-looking testimony that supports the trial court's findings. Dr. Schiff testified that if respondent were discharged, "there would be an immediate decompensation, given [respondent's] continued level of disorganization and . . . hallucinations." Dr. Schiff explained that without inpatient treatment, respondent would "immediately . . . plac[e] himself . . . [in] danger." *See In re Moore*, 234 N.C. App. at 44–45, 758 S.E.2d at 38 (affirming a commitment order where the trial court's finding of a "high risk of decompensation if released and without medication" supported the conclusion that respondent posed a danger to himself in the future). Dr. Schiff's concerns thus support the trial court's finding that

---

[3] The majority correctly recognizes that the trial court must actually find that respondent is a danger to himself; it "cannot simply be inferred from the record." Yet, the majority faults the trial court in its order for connecting respondent's active psychosis and his present symptoms to the risk that respondent poses a danger to himself but for failing to explain how respondent's symptoms lead to such a risk. Additionally, the majority contends that "the findings or evidence that one has been or currently is mentally ill, or has, in the past, 'decompensat[ed],' *without more*, does not make one dangerous to himself or others." Here, however, the trial court also found that (1) both respondent and the ACT team were unable to treat respondent's outpatient needs; (2) respondent is unable to perceive dangers to himself; (3) respondent is unable to obtain sufficient nourishment; and (4) respondent has been a victim of assaultive behavior which causes deterioration. These findings demonstrate how respondent's present symptoms affect his behavior and cause him to be a danger to himself.

respondent's symptoms caused him to be a danger to himself.

¶ 59    The trial court also found that respondent is noncompliant with his medication when he is not in the hospital and that respondent's ACT team brought him to the hospital because the team was unable to attend to his decompensation and his dental and nourishment needs. Dr. Schiff's testimony supports these findings. Dr. Schiff explained that respondent admitted he was not taking his medication, "which had previously stabilized him[,]" and that the ACT team was unable to support respondent's current "level of disorganization and decompensation" in the outpatient environment. Respondent's testimony also supports the trial court's finding that respondent and the ACT team were unable to meet respondent's dental and nourishment needs. Respondent testified that the ACT team had "started to give [him] at least breakfast," but he does not "get three meals a day" when he is not in the hospital. Thus, respondent was unable to obtain proper bodily nourishment, which is essential for respondent to sustain himself. Additionally, respondent testified that he "disregarded" the ACT team's suggestion that he take care of his teeth. Therefore, despite the ACT team's efforts, respondent was unwilling to take care of his dental needs. Therefore, the trial court's findings, supported by Dr. Schiff's testimony, indicate that respondent's symptoms, level of active psychosis, and dental

and nourishment needs could not be treated with outpatient resources.[4] As such, there is a reasonable probability that respondent's present symptoms would persist and increase his risk of suffering physical debilitation and further decompensation without inpatient care, and thus would cause him to be a danger to himself.

In sum, the trial court's findings of fact directly link respondent's past behavior and current symptoms to a risk of future harm. Respondent's history of mental illness and noncompliance with medication coupled with his current hallucinations, disorganized thoughts, active psychosis, and decompensation that could not be treated with outpatient resources indicate a reasonable probability of respondent suffering serious physical debilitation in the future. The Court of Appeals thus properly affirmed the commitment order. Accordingly, I concur in part and dissent in part.

Justice BERGER joins in this concurring in part and dissenting in part opinion.

---

[4] The majority concedes that the record could support a prima facie inference that respondent is unable to care for himself based on respondent's "grossly irrational" or "grossly inappropriate" behavior. The majority acknowledges, though, that such an inference alone cannot satisfy the second prong of the "dangerous to self" definition. Here, however, such a prima facie inference does not stand alone and is supported by Dr. Schiff's testimony that the ACT team is also unable to support respondent due to his decompensation and treat respondent's needs in the outpatient environment. Not only is respondent unable to care for himself, but the ACT team, the outpatient team specifically designed to assist respondent when he is not in the hospital, is also unable to see to respondent's needs. Thus, absent inpatient treatment, the trial court correctly concluded that respondent is a danger to himself.

Justice EARLS concurring in part and dissenting in part.

¶ 61      I dissent from the majority's holding on the due process issue in this case for the reasons stated in my dissenting opinion in *In re J.R.*, 2022-NCSC-127.

     Justices HUDSON and MORGAN join in this opinion concurring in part and dissenting in part.

Justice BARRINGER concurring in part and dissenting in part.

¶ 62      Although I agree with the majority's conclusion that respondent's due process right to an impartial tribunal was not violated for the reasons stated in *In re J.R.*, 2022-NCSC-127 and that the written findings of fact are insufficient to support the trial court's determination that respondent posed a danger to himself, I cannot agree with the conclusion that the evidence in the record in this matter is insufficient to satisfy the statutory criteria for involuntary commitment. Not only is this issue not before us, but the record is more than sufficient to satisfy the statutory criteria for involuntary commitment if proper findings of fact had been made. Therefore, I respectfully concur in part and dissent in part.

¶ 63    The only issue that respondent petitioned for review[1] by this Court is whether "the Court of Appeals err[ed] by concluding that the trial court's written findings of fact were supported by evidence and were sufficient to support its conclusion that [respondent] was dangerous to himself." We allowed respondent's petition for discretionary review on this issue, and that is the issue respondent briefed. The majority answered this question in the negative, and I agree with that conclusion. The trial court's written findings of fact were as follows:

> Respondent has [a] mental illness that being schizoaffective [disorder and] has long[-]standing [history] of mental illness which goes back to his late teens[.] [H]e is 33 [years old] now. Resp[ondent] suffers from hallucinations, disorganized thoughts[, and] is noncompliant with medications when not in [the] hospital. His active psychosis causes him to be a danger to himself and others. His [Assertive Community Treatment (ACT)] team initially had him committed as they were unable to see to his needs due to his decompensating [and] unable to sufficiently take care of needs that being dental [and] nourishment needs. [Respondent] lives with [a] person who has anger issues [and respondent] has been [a] victim of assaultive [behavior and] disturbing thoughts which cause deterioration [and] leaves [respondent] unable to perceive dangers to himself.

¶ 64    As identified by my colleagues, the trial court specifically found that respondent "*suffers* from hallucinations [and] disorganized thoughts" and has "*active*

---

[1] Respondent also appealed as of right to this Court on account of the dissenting opinion at the Court of Appeals. The dissent in the Court of Appeals disagreed with the Court of Appeals majority with respect to the due process issue.

psychosis" which "*causes* him to be a danger to himself." Psychosis is "[a]n acute or chronic mental state marked by loss of contact with reality, disorganized speech and behavior, and often by hallucinations or delusions, seen in certain mental illnesses, such as schizophrenia." *Psychosis*, *The American Heritage Dictionary* (5th ed. 2018). However, the trial court's other findings focused on the respondent's state and his outpatient team's (ACT team) inability to care for him *at the time of his commitment*, rather than his outpatient team's ability to care for him and the consequences if respondent was released out of inpatient care *at or around the time of the hearing*.

¶ 65        Going further than assessing the findings of fact is neither necessary nor appropriate under Rule 16 of our Rules of Appellate Procedure. N.C. R. App. P. 16(a) ("[R]eview in the Supreme Court is limited to consideration of the issues stated in the notice of appeal filed pursuant to Rule 14(b)(2) or the petition for discretionary review and the response thereto filed pursuant to Rule 15(c) and (d), unless further limited by the Supreme Court, and properly presented in the new briefs required by Rules 14(d)(1) and 15(g)(2) to be filed in the Supreme Court.").

¶ 66        However, if we reach the issue of whether the record is sufficient to satisfy the statutory criteria for involuntary commitment, specifically the "dangerous to self" portion of the statute, this Court should conclude that the testimony from respondent's attending physician and respondent himself, as reflected in the transcript, is sufficient to support a conclusion that respondent is dangerous to

himself.

¶ 67        The relevant subsection of the statute is as follows:

>    a.  Dangerous to self. — Within the relevant past, the individual has done any of the following:
>
>    1.  The individual has acted in such a way as to show all of the following:
>
>        I.   The individual would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations, or to satisfy the individual's need for nourishment, personal or medical care, shelter, or self-protection and safety.
>
>        II.  There is a reasonable probability of the individual's suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. *A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself or herself.*
>
>            . . . .
>
>        *Previous episodes of dangerousness to self, when applicable, may be considered when determining reasonable probability of physical debilitation, suicide, or self-mutilation.*

N.C.G.S. § 122C-3(11)(a) (2021) (emphases added).

At the hearing, Dr. Max Schiff testified that he was concerned that "if [respondent] were to be discharged, that there would be an immediate decompensation." He explained that immediate decompensation would lead to respondent being placed "into a hospital or into a situation placing himself or others at danger at this point." Decompensation in psychiatry is "the failure to generate effective psychological coping mechanisms in response to stress, resulting in personality disturbance or disintegration, esp[ecially] that which causes relapse in schizophrenia." *Decompensation*, *New Oxford American Dictionary* (3rd ed. 2010); *see also Decompensation*, *The American Heritage Dictionary* (5th ed. 2018).

Dr. Schiff also testified that just the week prior to the hearing he and respondent's Assertive Community Treatment team met with respondent and the ACT team "felt that [respondent was] quite far from his baseline last week." Dr. Schiff explained that he continues to work with the ACT team "in attempting to assess [respondent's] baseline and whether or not they are able to support him in the community." Dr. Schiff testified that the ACT team felt that "they could no longer support [respondent] in the community based on his level of disorganization and decompensation last week." Dr. Schiff further testified that respondent's behavior was "disorganized and psychotic in nature" and that "there has been some aggression and aggressive behavior before." While Dr. Schiff has been "pleased with

[respondent's] response [to treatment] so f[a]r," Dr. Schiff stated, "[H]e remains with a high level of psychosis that makes me concerned about his decompensation, were he . . . to be released and not in the monitored setting."

¶ 70        Respondent also testified at the hearing. When asked by his counsel with whom he lived, respondent stated:

> My brother and my friend. My — he's my brother first, but he's my friend second. I was in a relationship with him for 8, 9, 10 years. But it wasn't be nothing sexually wise like that with him again. And his best friend, which is my roommate, which is my brother.

¶ 71        When asked whether he would like to be released from commitment, respondent did not answer the question but instead responded, "I see her ankles and Amy — the Amy at Williams Ward — Williams Ward remind me of my mom's ankles, and she takes her water pills in the morning. I remind her." Respondent also acknowledged that he was having hallucinations and explained that he "see[s] angels, white dots . . . floating in the air" and "black dots," which "just might be hallucinations or . . . negativity."

¶ 72        Given this record, there was more than sufficient testimony to support a conclusion that respondent is dangerous to himself. The trial court could have made findings of fact that linked respondent's past behavior and current symptoms to a risk of future harm if inpatient treatment was discontinued. Therefore, I concur in part and dissent in part.