IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-1316

Filed: 2 August 2016

Buncombe County, No. 15SPC943

IN THE MATTER OF: W.R.D., III

Appeal by respondent from order entered 11 June 2015 by Judge Andrea Dray in Buncombe County District Court. Heard in the Court of Appeals 25 May 2016.

*Attorney General Roy Cooper, by Assistant Attorney General Elizabeth Guzman, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Daniel L. Spiegel, for respondent.*

DIETZ, Judge.

Respondent appeals from the trial court's order of involuntary commitment. Following a hearing, the trial court found that Respondent was a danger to himself and others and ordered him to be institutionalized for 30 days.

As explained below, we reverse the commitment order. The record indicates that Respondent suffers from schizophrenia; that he refused to take his prescription medication both for his mental illness and an unrelated heart condition; that he lost some "unknown amount" of weight but remained at a healthy weight; that he warned his guardian to stay away from him or he would sue him; and that he was angry and rude to hospital staff after being involuntarily committed.

This evidence cannot support the trial court's ultimate findings that Respondent posed a danger to himself or others. Our holding today does not mean that Respondent is competent, or that he cannot properly be committed at some future hearing. We simply hold that the evidence in the record on appeal is insufficient to satisfy the statutory criteria for involuntary commitment. Accordingly, we reverse the trial court's order.

## Facts and Procedural History

In 2003, Respondent was diagnosed with schizophrenia. Respondent always has disputed this diagnosis and continues to do so today.

Because of Respondent's health issues and his failure to attend to his basic needs, Respondent's mother was appointed as his guardian and Social Security payee. She continued in that capacity until 2015, when Hope for the Future, an organization that offers guardianship services, began working with Respondent and ultimately assigned Kevin Connor to serve as his guardian.

Respondent refused to meet with Connor, who was a complete stranger to him. Connor tried to arrange an in-person meeting with Respondent on four different occasions with no success. Respondent spoke to Connor several times on the phone. During those calls, Respondent denied having a mental illness and denied needing any assistance from Connor. According to Connor, Respondent also left him voice

messages, which included statements such as "You'd better back off, Jack," and "Don't you come around me. I will sue you into the ground."

On 29 May 2015, Connor filed an affidavit and petition to have Respondent involuntarily committed. Respondent was hospitalized at Mission Hospital Copestone in Asheville. Dr. Martha Moore examined Respondent upon admission to the hospital and recommended he receive inpatient treatment for 30 days. Dr. Trace Fender performed a second examination on 1 June 2015 and also concluded that Respondent was in need of inpatient treatment for 30 days. Three days later, on 4 June 2015, Connor had his first and only in-person meeting with Respondent.

The trial court held a hearing on the involuntary commitment petition on 11 June 2015. Three witnesses testified at the hearing. First, the Court heard from Connor, Respondent's guardian. Connor testified that Respondent had acted in a "menacing" way towards representatives from Hope for the Future, although he conceded Respondent was never violent and never threatened violence. He also testified that Respondent had allegedly written and left a letter for his ex-wife at her home despite not being permitted onto his ex-wife's property. Finally, Connor testified that Respondent was not taking his medications to treat his schizophrenia and a serious heart condition. Connor conceded on cross-examination that Respondent had never shown any indications of physical violence and had never engaged in any self-harming behavior.

Respondent also testified. He expressed confusion regarding his hospitalization. He claimed that he had "not broken any law or anything," and he thought that his hospitalization stemmed from an issue with his Social Security payments. He testified that he was no longer in need of a guardian; that he had plenty of food in his house; that he was able to work odd jobs to earn additional money; that he had purchased his own vehicle; and that he was willing to take his heart medication but would not take any medication prescribed to treat mental illness.

Finally, Dr. Frederick Weigel, a staff psychiatrist at Copestone, testified as an expert witness in general psychiatry. He testified that in his opinion Respondent was schizophrenic and that he was unable to "maintain his own nourishment and medical care." Dr. Weigel's opinion concerning Respondent's nourishment was based solely on his understanding that Respondent had lost some "unknown amount" of weight before his involuntary commitment. Dr. Weigel acknowledged that Respondent's current weight was not unsafe. Dr. Weigel's opinion that Respondent could not maintain his own medical care was based on Respondent's refusal to take his prescription medications for schizophrenia and his heart condition.

At the conclusion of the hearing, the trial court found that Respondent "is mentally ill, poses a threat to himself and others, is unable to take [sic] maintain his nutrition, that it is not medically safe for Respondent to live outside of an inpatient commitment setting, and that no less restrictive treatment measure than inpatient

treatment would be medically appropriate." As a result, the trial court ordered Respondent to undergo 30 days of involuntary commitment at Mission Hospital Copestone. Respondent timely appealed.

## Analysis

Respondent argues that the trial court's determination that he is a danger to himself or others is not supported by competent record evidence. As explained below, we agree and therefore reverse the trial court's commitment order.

As an initial matter, we note that Respondent's appeal is not moot although his 30-day commitment period has lapsed. The possibility that Respondent's commitment might "form the basis for a future commitment, along with other obvious collateral legal consequences," preserves his right to appellate review despite the expiration of his commitment period. *In re Hatley*, 291 N.C. 693, 695, 231 S.E.2d 633, 635 (1977).

To support an involuntary commitment order, the trial court is required to "find two distinct facts by clear, cogent, and convincing evidence: first that the respondent is mentally ill, and second, that he is dangerous to himself or others." *In re Lowery*, 110 N.C. App. 67, 71, 428 S.E.2d 861, 863–64 (1993); N.C. Gen. Stat. § 122C–268(j). These two distinct facts are the "ultimate findings" on which we focus our review. *See In re Moore*, 234 N.C. App. 37, 43, 758 S.E.2d 33, 37–38 (2014). But unlike many other orders from the trial court, these "ultimate findings," standing

alone, are insufficient to support the order; the involuntary commitment statute expressly requires the trial court also to "record the facts upon which its ultimate findings are based." *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980); N.C. Gen. Stat. § 122C–268(j).

We review the trial court's commitment order to determine whether the ultimate finding concerning the respondent's danger to self or others is supported by the court's underlying findings, and whether those underlying findings, in turn, are supported by competent evidence. *See In re Booker*, 193 N.C. App. 433, 437, 667 S.E.2d 302, 305 (2008).

## I.     Danger to Self

Respondent first challenges the trial court's ultimate finding that he was "dangerous to himself." To find danger to self in these circumstances, the trial court must find that Respondent "would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety" and that "there is a reasonable probability of his suffering serious physical debilitation within the near future" without involuntary commitment. N.C. Gen. Stat. § 122C–3(11).

The trial court's commitment order contains only two findings of fact that could be construed to support these statutory criteria. First, the trial court found that "it is not medically safe for Respondent to live outside of an inpatient commitment setting" because "Respondent maintains a belief that another doctor is his treating physician and will not be treated by Dr. Weigel"; "Respondent is diagnosed with paranoid schizophrenia, for which Respondent has refused treatment"; and "Respondent has heart health related issues, for which he is not compliant with prescribed medical treatment." Second, the trial court found that Respondent was "unable to take [sic] maintain his nutrition." The trial court did not include any additional findings of fact concerning Respondent's nutrition.

Neither of these findings is sufficient to support the trial court's ruling. With respect to Respondent's refusal to acknowledge his mental illness, and refusal to take his prescription medication, the record does not demonstrate a "reasonable probability of his suffering serious physical debilitation within the near future" without immediate, involuntary commitment. To be sure, Dr. Weigel testified that Respondent's refusal to take his heart medication "could be deadly," but he did not testify that ceasing that medication would create this serious risk "within the near future." In similar cases, this Court has held that the evidence must demonstrate "a reasonable probability" that the health risk will occur in the "near future," not simply that it could place the respondent at risk at some future time. *See, e.g.*, *In re Whatley*,

224 N.C. App. 267, 273, 736 S.E.2d 527, 531 (2012). Here, there is no evidence that Respondent's refusal to take his medication creates a serious health risk in the near future.

Second, the trial court's finding that Respondent was unable to "maintain his nutrition" is not supported by competent evidence. It is apparently based solely on the following opinion testimony of Dr. Weigel:

> Q: Have you reached a conclusion, to a degree of medical certainty, as to the respondent's ability to maintain his own nourishment and medical care?
>
> A: I do not think he can maintain that independently.

In an involuntary commitment proceeding like this one, "the premises underlying an expert's opinion must be made known to the trier of fact in order that the trier of fact may properly evaluate the opinion." *In re Collins*, 49 N.C. App. at 247, 271 S.E.2d at 75. In the record, Dr. Weigel's only testimony concerning Respondent's "nourishment" is that he lost some "unknown amount" of weight but that his current weight was safe. That testimony is not sufficient to support a finding that Respondent could not "satisfy his need for nourishment" and faced a "reasonable probability of his suffering serious physical debilitation" without involuntary commitment. Accordingly, the trial court's findings concerning Respondent's inability to "maintain his nutrition" are not supported by competent evidence.

## II.    Danger to Others

We next turn to the trial court's finding that Respondent posed a danger to others.  Under N.C. Gen. Stat. § 122C–3(11)(b), an individual is "dangerous to others" if "within the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property" and "there is a reasonable probability that this conduct will be repeated."

The trial court's commitment order contains only two findings of fact that could be construed to support these statutory criteria.  First, the trial court found that "Respondent made a threat, although not of physical violence, towards Mr. Connor." Second, the trial court found that "Respondent displayed hostile, aggressive behaviors in interviews" at the hospital.  But, importantly, neither of these findings of fact indicates that Respondent "inflicted," "attempted to inflict," "threatened to inflict," or "acted in such a way as to create a risk of serious bodily harm" to another. Indeed, the first finding expressly acknowledges that the "threat" Respondent made to Connor was *not* a threat of "physical violence," much less "serious bodily harm." Rather, Respondent warned Connor to stay away or "I'll sue you into the ground." While one might experience some emotional (or metaphorical) pain from being sued,

the threat to sue someone simply cannot be viewed as a threat to inflict "serious bodily harm."

Likewise, Dr. Weigel's testimony concerning Respondent's "intrusive" and "aggressive" behavior does not support the trial court's finding that he is a danger to others. Dr. Weigel testified, in essence, that Respondent was angry and rude after being institutionalized, and refused to cooperate with the hospital staff:

> [Respondent] has been persistently hostile and intrusive and aggressive with [hospital] staff. He has been refusing treatment or medications. He has largely refused to be interviewed . . . . He was very hostile repeatedly sticking his finger in our face yelling paranoid thoughts that his guardian—well, that he had no guardian; that his guardian was sent by the government to take pictures of his house and steal his money; was very forcefully insistent that he would refuse treatment and fight it if it was given to him.

Nothing in this testimony indicates that Respondent "has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another." *See* N.C. Gen. Stat. § 122C–3(11)(b).

Simply put, the record does not support the trial court's findings that Respondent was a danger to himself or others. Accordingly, we reverse the trial court's commitment order. We note that our holding today does not mean that Respondent is competent, or that he cannot properly be committed at some future hearing. We hold only that, on the record in this appeal, the trial court's findings are

insufficient to satisfy the statutory criteria for involuntary commitment. Accordingly, we reverse the trial court's order.

## Conclusion

The trial court's involuntary commitment order is

REVERSED.

Judges ELMORE and DAVIS concur.