BRYANT, Judge, dissenting.
*454 Because I believe the evidence and findings were sufficient to support the trial court's ultimate finding that respondent failed to make reasonable progress in correcting the conditions which led to the child's removal to the satisfaction of the trial court, I would hold the findings support the conclusion that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) to terminate respondent's parental rights. Thus, for the following reasons, I respectfully dissent.
"If the trial court's findings of fact 'are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary.' " In re S.C.R. , 198 N.C. App. 525, 531, 679 S.E.2d 905, 906 (2009) (quoting In re Williamson , 91 N.C. App. 668, 674, 373 S.E.2d 317, 320 (1988) ). We review whether a trial court's findings of fact support its conclusions of law de novo . See In re S.N. , 194 N.C. App. 142, 146, 669 S.E.2d 55, 59 (2008) (citation omitted). "We review the trial court's decision to terminate parental rights for abuse of discretion." In re Anderson , 151 N.C. App. 94, 98, 564 S.E.2d 599, 602 (2002) (citation omitted). "The trial court is 'subject to reversal for abuse of discretion only upon a showing ... that the challenged actions are manifestly unsupported by reason.' " In re J.L.H. , 224 N.C. App. 52, 57, 741 S.E.2d 333, 337 (2012) (alteration in original) (quoting Clark v. Clark , 301 N.C. 123, 129, 271 S.E.2d 58, 63 (1980) ).
Here, in support of its conclusion that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), (2), and (6) to terminate respondent's parental rights, the trial court made the following evidentiary findings of fact:
7. Petitioners have known Respondent since she was a teenager and are intimately familiar with Respondent's mental health issues and treatment. Respondent has a bipolar diagnosis. Since the juvenile was placed with the caregivers in 2010, Respondent has had multiple episodes related to her mental illness that have left her incapable of properly caring for the juvenile. Petitioners have had intimate knowledge of these episodes.
....
10. However, Respondent's behavior during the visits in Pennsylvania was consistently concerning and demonstrated an ongoing and continuing inability to provide proper care. In 2015, this Court changed the visitation order to no longer require Petitioners to house Respondent during her quarterly visits. Respondent's behavior *678 in their *455 home was disturbing and was adversely impacting the juvenile. Respondent has not always acted in the juvenile's best interest during visits. By way of example, during one visit, Respondent indicated she was hungry. Petitioners allowed Respondent to take the juvenile to a restaurant. Respondent bought and ate food, but Respondent did not buy anything for the juvenile. By way of further example, the juvenile has directed Respondent to end a visit early so that she might rest. While Petitioners have felt comfortable leaving the juvenile with Respondent in their home for short unsupervised periods of time during visits, Petitioners have never felt Respondent was capable of supervising the juvenile for any extended period of time .
11. Respondent has been working with the UNC ACT ("Assertive Community Treatment") team for several years, since at least before Petitioners attempted to reunite the juvenile with Respondent in 2013. ACT provides "wrap-around" services for individuals with significant mental health concerns. Even with the provision of these intense services, Respondent is unable to provide proper care for the juvenile. Dr. VanderZwaag testified Respondent would be capable of parenting the juvenile with assistance, but Dr. VanderZwaag has never observed Respondent with the juvenile. Dr. VanderZwaag acknowledged Respondent was last hospitalized due to her mental health illness in December 2015, more than five years after this case began due to similar mental health concerns.
12. Petitioners have observed Respondent over the course of many years, and Petitioners have an intimate familiarity with Respondent's parenting abilities. Petitioners are convinced Respondent lacks the ability to properly care for the juvenile. Petitioners would not hesitate to reunite the juvenile with Respondent if they thought otherwise. Petitioners have allowed Respondent to have "extra" visitation outside of the court-ordered schedule. Petitioners did not file the termination petition lightly. The Court believes Petitioners and accepts their testimony as true.
(Emphasis added). The trial court then made ultimate findings of fact:
13. Respondent has neglected the juvenile and there is a reasonable probability Respondent would neglect the juvenile if he were returned to her care.
*456 14. Respondent has willfully left the juvenile in placement outside the home for more than twelve months without showing to the satisfaction of this Court that reasonable progress under the circumstances has been made in correcting the conditions which led to the removal of the juvenile.
15. Respondent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and there is a reasonable probability that such incapability will continue for the foreseeable future. Respondent lacks an appropriate child care arrangement.
Respondent does not contest that she willfully left her child in placement outside the home for more than twelve months; indeed, it has been over five years. Instead, respondent contends-and the majority agrees-that the trial court's findings of fact are insufficient to support its ultimate finding that she failed to make reasonable progress in correcting the conditions that led to the child's removal. She challenges the findings as being "vague" and "incomplete," arguing that they do not address her progress or lack of progress leading up to the termination hearing. As a result, the majority has determined that the findings of fact are insufficient to support its conclusion that grounds existed to terminate her parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(2). I respectfully disagree.
To terminate parental rights under N.C. Gen. Stat. § 7B-1111(a)(2), "the trial court must perform a two-part analysis." In re O.C. & O.B. , 171 N.C. App. 457, 464, 615 S.E.2d 391, 396 (2005) (citing In re Baker , 158 N.C. App. 491, 494, 581 S.E.2d 144, 146 (2003) ).
The trial court must determine by clear, cogent and convincing evidence that a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and, further, that as of the time of the hearing, as demonstrated by clear, cogent and convincing *679 evidence, the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.
Id. at 464-65, 615 S.E.2d at 396.
"Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort."
*457 Id. at 465, 615 S.E.2d at 396 (quoting In re McMillon , 143 N.C. App. 402, 410, 546 S.E.2d 169, 175 (2001) ). "A finding of willfulness is not precluded even if the respondent has made some efforts to regain custody of the child[ ]." Id. (quoting In re Nolen , 117 N.C. App. 693, 699, 453 S.E.2d 220, 224 (1995) ).
According to unchallenged Finding of Fact No. 3, the child was removed from respondent's care due to respondent's mental health issues and drug use and DSS's concern for the juvenile's care and well-being. A review of the record and transcript indicates the competent evidence also supports the trial court's other findings of fact.
In Finding of Fact No. 7, the trial court found that respondent has had multiple episodes relating to her mental illness since her diagnosis in 2011. Respondent argues the finding fails to include any information pertaining to what constituted an "episode" and the nature of the "episodes," including respondent's condition and behavior during one.
However, the transcript reveals that the latest episode respondent experienced was "a manic episode," for which she was hospitalized and involuntarily committed. From these facts, the trial court could reasonably infer that these episodes, including the one she suffered fifteen months prior, were of a dangerous nature-at least one resulted in her hospitalization and involuntarily commitment. See In re W.R.D. , --- N.C. App. ----, ----, 790 S.E.2d 344, 347 (2016) ("To support an involuntary commitment order, the trial court is required to 'find two distinct facts by clear, cogent, and convincing evidence: first that the respondent is mentally ill, and second, that he is dangerous to himself or others .' " (emphasis added) (citation omitted) (quoting In re Lowery , 110 N.C. App. 67, 71, 428 S.E.2d 861, 863-64 (1993) ) ). Thus, we conclude the competent evidence supports the trial court's Finding of Fact No. 7, which finding is also sufficiently specific to support the trial court's ultimate findings and conclusions of law. See In re D.M.O. , --- N.C. App. ----, ----, 794 S.E.2d 858, 861 (2016) ("[A] trial court must make adequate evidentiary findings to support its ultimate finding...." (citation omitted) ).
In Finding of Fact No. 10, the trial court found that respondent's behavior during her visits was "consistently concerning" and "disturbing." Respondent argues the trial court failed to find with any particularity what behavior it found to be "concerning" and "disturbing[,]" and whether this behavior related in any manner to respondent's mental health and her ability to care for the child.
To the contrary, the trial court included a specific example of respondent's behavior that the trial court found to be "disturbing"-the *458 fact that respondent took the juvenile to a restaurant and purchased food only for herself. By arguing that the trial court was insufficiently particular in making this finding, respondent is essentially asking this Court to reweigh the evidence, in other words, reconsider the evidence in making a determination of what constitutes "disturbing" or "concerning" behavior. This Court should decline to engage in such reweighing of the evidence.
Here, the competent evidence supports the trial court's Finding of Fact No. 10. At the hearing, the petitioner caregivers testified as follows regarding respondent's behavior:
Q. ... [Y]ou said earlier she was in and out of the hospital. Was she out of the hospital and into a hospital at any time when you were in Pennsylvania?
A. Yes, she was.
Q. When was that?
Q. I think in 2015. But I remember she was in-in the hospital in-at UNC, but they felt that was too long a timespan in the psychiatric care. And then she had to go to a long-longer term hospitalization.
Q. How do you know that? She told you that?
A. Yes, she told us.
*680 Q. Did that interfere with any of her visits?
A. I think we had two. We-we-she had to skip a visit at the time.
Q. When was the last visit you had with her? Or when was the last time-she was in Pennsylvania to visit [the child]?
A. Last Christmas 2016.
Q. How did that visit go?
A. That visit was a little choppy. She-she-on the day she was to be there at 5:00-at-at noon, it was 2:30 we were calling her to say where are you, where are you? And the day before that she seemed too tired that [the child] had to say well, why don't you just go home and go to sleep?
*459 ....
Q. During that visit did you-your opinion change about whether you'd feel comfortable leaving [the child] with her as a full-time caregiver?
A. Yeah, it's-it's one of those times we felt this-this won't-this won't work. It wouldn't work to-to-to leave her because the difficult thing is-is-it's not knowing which [respondent] were-we have. We know [respondent] by nature is a very caring about her son. But in terms of her engagement and doing the things that are necessary in making the right decisions, it's-we feel it's off in deciding-like the prior visit she would decide that taking portraits for the son is more important than getting him say pull-ups to keep him from soiling his bed....
....
A. ... [W]e suggested to her-well, see [the child] was soiling his bed and we-we-we get him pull-ups and we-and we said well, why don't you get him some pull-ups. Just invest a little bit in getting some pull-ups. But she said I only have money to have portraits done, so I can't get-you know, the pull-ups is not something I can get.
And so-and so it happened that the day that she went to do the portrait, she couldn't do that at the time because they didn't have appointment and she took him out to-she went with him, because she felt she was hungry, she went and-and sat and ate. And-and so [the child] said well, I'm hungry now when he-when they returned. And she said well, that you-did you eat with your mom and he said well, he had some bite[s] from her meal, but she ate and did not provide food for him at the time. So it's just-that's what I mean by not knowing which [respondent] is going to show up.
....
Q. In your opinion, can she be a full-time caregiver to [the child]?
A. No, not at this time I don't think so.
Q. Do you feel pretty confident about that?
*460 A. Yes.
The other petitioner caregiver testified as follows regarding respondent's progress:
Q. Do you have concerns about [respondent's] behavior that you've witnessed during [her] visits [with the child]?
A. I've witnessed [respondent] not being the same [respondent] each time. She's always a little different. Sometimes she's very attentive. Like one visit I thought let's just send him home right away, because she was so awesome with him. She helped him with his homework and she was-she was loving and she did all the right things and she disciplined him.
And then the next one, she was totally out to lunch. It was like a totally different person compared to the person that was there before. And it-and it's been consistent like that. Some days-some visits she'd be-she'd be absolutely wonderful and some visits she just wasn't there.
Q. Are there any specific instances of behavior that you found troubling?
A. Well, the last one, because it's in my mind so clearly is when she drove and she got in a little later than she thought. So she went to-and slept and then she woke up and came over to the house and [the child] felt that she was tired. And he suggested that she go home. And-and he told me, he said, you know, I told my mom that she's tired and she has to go home. And I said, oh, okay. You know, what am I going to say? [The child] loves his mother dearly.
*681 He knows his mother. He doesn't believe that his mother can take care of him, but he cares very much about her wellbeing.
So the next day, we were waiting for her to come and at 2:30 I called and I said well, aren't you going to come and have time with [the child]? And she was just getting up. So by the time she did come, it was a little bit later. But [the child] happened to be sick that day. So she was able to stay longer with him. And she even-I had to go out and she stayed with him for two hours. I had set up everything so that it was pretty simple for her to-to-to do.
*461 I mean, I had dinner ready for her to make and I had-I had his-his stuff altogether and so it was pretty straightforward.
....
Q. Would you support the mother having custody of [the child] if you thought she could do it?
A. If I thought she could do it, I would definitely support that, yes.
Q. I gather you do not think she can do it?
A. I do not think she can do it at this time.
The testimonial evidence above shows that even as late as December 2016, respondent's last visit with the juvenile, she had not progressed to the point where she could take custody and care of the child.
In Finding of Fact No. 11, the court found that "[e]ven with the provision of [the ACT] intense services, Respondent is unable to provide proper care for the juvenile." Respondent argues the trial court made no finding as to why or how, despite these services, respondent was not able to provide proper care for the child or what specifically she was doing or not doing to address her mental health issues. Respondent's argument to the contrary, the testimony excerpted above is competent evidence that illustrates that respondent continued to exhibit signs of mental instability and was not able to provide proper care for the child-petitioners, whom the trial court specifically found it "believed" and that whose trial testimony it accepted "as true," testified that respondent could not properly care for the child at the time of the hearing. There was simply no evidence before the trial court that respondent had made reasonable progress-for over five years-in correcting the conditions that led to removal of the child.
The competent evidence supports the trial court's Findings of Fact Nos. 10 and 11, which in turn support the trial court's ultimate finding and conclusion that respondent has willfully left the child in placement outside the home for more than twelve months without showing reasonable progress has been made under the circumstances. Because the evidence and findings were sufficient to support the court's ultimate finding that respondent failed to make reasonable progress in correcting the conditions which led to the child's removal to the satisfaction of the court, I would hold the findings support the conclusion that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) to terminate respondent's *462 parental rights. Therefore, there was no abuse of discretion by the trial court in ordering the termination of respondent's parental rights.
Accordingly, I would affirm the trial court's order terminating respondent's parental rights to the child. I respectfully dissent from the majority opinion.