IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-839

No. COA21-694

Filed 20 December 2022

Granville County, No. 21 SPC 42

IN THE MATTER OF: E.B. AAU/MPU WARDS GRANVILLE COUNTY

Appeal by respondent from order entered 4 March 2021 by Judge John H. Stultz in Granville County District Court. Heard in the Court of Appeals 9 August 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General John Tillery, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Hannah Hall Love, for respondent-appellant.*

TYSON, Judge.

¶ 1    E.B. ("Respondent") appeals from an order requiring 90 days of inpatient commitment as being mentally ill and being dangerous to self. We affirm.

## I. Background

¶ 2    Dr. Gary Pohl ("Petitioner") a state employee who is employed at Central Regional Hospital signed and filed a petition seeking Respondent's involuntary commitment on 21 January 2021, opining she "has a very extensive history of severe mental illness," was "noncompliant with medication and she is currently very psychotic," and was experiencing "paranoid delusions." Respondent underwent a first

examination the following day, with the physician-examiner, Dr. Barbara Mattox, MD, who opined Respondent was "dangerous to herself or others." The examiner specifically noted Respondent believed: (1) someone had implanted tracking devices into her ears, vagina, and uterus; (2) she had undergone genital mutilation; and, (3) that a "snake filled with cocaine" was inside of her gastrointestinal tract.

¶ 3  The trial court ordered Respondent to inpatient involuntary commitment for 30 days, based upon the report and findings "she cannot take care of her physical and medical needs outside of Central Regional Hospital at this time. [Respondent] would cease to take medications if released leading to her decompensation."

¶ 4  Dr. Justin Gettings, Respondent's treating physician, completed another examination on 25 February 2021 and opined Respondent was still dangerous to herself. According to his examination, Dr. Gettings concluded Respondent "remained psychotic and delusional. She believes she has cocaine filled snakes and retained fetal products in her uterus. . . . At present[,] [Respondent] represents a danger to herself if discharged in her current condition."

¶ 5  A re-hearing on Respondent's continued involuntary commitment was held on 4 March 2021. Dr. Gettings testified for the State, and opined Respondent currently suffers from "schizoaffective disorder, bipolar type." He further opined Respondent continued to and would be a danger to herself if discharged. He based his opinion upon observations, despite treatment with medication, Respondent "continue[s] to

have persistent delusions that . . . pose a danger to her and make her unsafe to return

to the community at this time." Specifically, Dr. Gettings testified:

> [W]hen [Respondent] initially presented, [she] had a
> delusion that she'd actually had something retained in her
> uterus. So the content of what has been retained has
> changed over time, but it's varied from either a cocaine-
> filled snake—she's mentioned that she has retained fetal
> product from a prior abortion.
>
> I was worried initially, during the initial part of her
> admission, that she was actually doing self-examinations
> of her utero-genital region which could pose potentially a
> physical danger to herself. . . . [E]ven as recently as this
> morning, [Respondent] was advocating that she still has
> retained material in her uterus.
>
> The second delusion that has been very prominent is that
> [she] continues to endorse that she's the owner of the Pepsi
> Cola Company. She stated that she had sole ownership of
> this product and is owed distributions—financial
> distributions from the sale of this product. . . . These
> delusions have remained persistent in spite of treatment.
>
> Third . . . , she has a lot of concern and questioning about
> the credentials of people involved in her care. . . . [S]he has
> questioned credentials of some of my colleagues.
>
> She's also questioned the credentials of attorneys that are
> representing her in a custody case in Durham County.
> She's told me multiple times that she's had those
> individuals disbarred. [Respondent] has a history of filing,
> you know, litigation against folks in Durham County
> related to that custody battle and getting restraining
> orders.
>
> I'm bringing all this up because I worry that, if she's in a
> position in the community where she questions the
> credentials of professionals, including, you know,

potentially police or people that are representing her in civil matters, it could put her at risk and danger to herself.

So those are the three main areas.

¶ 6 When asked by the State whether Respondent might injure herself while engaging in self-examinations of her genitalia and uterus if released, Dr. Gettings responded: "I mean—on a very concrete fashion, yes. I would worry just with, you know, it's an odd delusion . . . . Yes." Dr. Gettings further asserted his opinion it is reasonably probable Respondent would suffer physical debilitation, if immediately released because "she engages in poor self-care, tenuous housing which definitely put[s] her at risk to herself." He also opined, "if we don't have her fully—fully treated and fully at her baseline, she has a high risk of decompensating and requiring repeat or further hospitalization in the future."

¶ 7 Respondent's counsel elicited expert testimony and competent evidence tending to show she had previously lived independently, was compliant with the hospital's rules, has engaged in treatment, and was improving in her condition. Dr. Gettings responded and opined, "I don't believe she's at her baseline, and that formulation is coming from reviewing past medical records. . . . I do think that there is potentially room for ongoing improvement."

¶ 8 When asked what steps have been taken to try and accommodate Respondent's future discharge, Dr. Gettings asserted "she's essentially homeless," and caregivers

had pursued lodging through a transitional housing program. That housing program placed Respondent's application on hold because "the people who organize that program have very significant concerns about [Respondent's] stability and ability to sort of live independently."

Respondent was also sworn, testified, and asserted she would be able to find immediate employment and she had enough money to pay for lodging in short-stay hotels. She testified to continuing to have an obstruction in her gastrointestinal tract and/or uterus despite contrary medical tests, examinations, and treatment revealing no such presence or obstruction.

Respondent also denied needing medication: "Pretty much all of my pills and stuff that was ordered by [Dr. Gettings]. . . . I don't see the problem with me. I see the problem with staff and the billing error. . . . I see, you know, me being consistently held back." While Respondent stated she took laxatives multiple times a day to treat the purported obstructions and blockages, Dr. Gettings did not testify to that effect.

The trial court found and concluded Respondent was mentally ill and dangerous to herself and required further involuntary commitment:

> she suffers from a mental illness, which is schizoaffective disorder. . . . [S]he is currently in possession of a delusion, that there is something retained within her body and . . . that there are other items that are inside of her body that are causing a blockage. The Court finds that these complaints have been medically checked out (sic) and are continuing to be evidence of a delusion. The Court finds

that she has persisted in this delusion and that the delusion has changed in nature from a cocaine-filled snake to fetal material to now a blockage in her gastro-intestinal tract that has resulted in her need for high doses of laxatives.

The Court finds that this type of behavior is likely to cause physical self-injury if not stabilized by medication. The Court finds that she does not have adequate insight into her mental health issues. She has indicated that she does not need medication.

. . . .

She has been unable to maintain safe, stable housing and that, without this stable housing coupled with her—her own testimony about how she arrived at Central Regional Hospital is incredible, and therefore, that [she] would pose a significant debilitation if she were outside of this hospitalization.

¶ 12   The trial court found Respondent's asserted gastrointestinal or uterine blockage(s) were found to be non-existent and Respondent's "delusional thinking puts [her] at risk for self-inflicted injury due to attemtps [sic] to remove an internal iobstruction [sic]." The Court also found that Respondent's "[n]on-compliance of medication, the lack of stable housing and lack of insight into her condition, taken together, pose a[] serious risk of rapid decompensation if in the community. She therefore poses a significant danger to herself." The trial court concluded and ordered Respondent to be involuntarily committed for 90 days on 4 March 2021, and expressly incorporated Dr. Gettings' report into its oral findings. Respondent appealed.

## II.   Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b)(2) and 122C-272 (2021). "When the challenged order may form the basis for future commitment or may cause other collateral legal consequences for the respondent, an appeal of that order is not moot." *In re Webber*, 201 N.C. App. 212, 217, 689 S.E.2d 468, 472-73 (2009). This appeal is properly before this Court "notwithstanding the fact that the period of [Respondent's] involuntary commitment has ended." *In re Whatley*, 224 N.C. App. 267, 270, 736 S.E.2d 527, 529 (2012) (citation omitted).

### III.  Issues

Respondent asserts the evidence and the trial court's findings are inadequate to support the conclusions of being mentally ill and of being dangerous to herself. She claims the evidence and findings fail to draw the requisite "nexus between past conduct and future danger" required to make and sustain such a conclusion. *In re J.P.S.*, 264 N.C. App. 58, 63, 823 S.E.2d 917, 921 (2019) ("Although the trial court need not say the magic words 'reasonable probability of future harm,' it must draw a nexus between past conduct and future danger.") (citation omitted)).

### IV.  Analysis

### A. Standard of Review

Respondent, like all individuals before the district court and this Court, is presumed to be sane and is entitled to her liberty and right to be free of restraint. *See* N.C. Const. art. I, § 19 ("No person shall be taken, imprisoned, or disseized of his

freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land."); S*ane, Black's Law Dictionary* (11th ed. 2019) ("Having a relatively sound and healthy mind; capable of reason and of distinguishing right from wrong."); *Olmstead v. United States*, 277 U.S. 438, 478, 72 L. Ed. 944, 956 (1928) (Brandis, J., dissenting) (The founders "conferred, as against the Government, the right to be let alone – the most comprehensive of rights and the right most valued by civilized men."). The State's burden of proof to deprive Respondent of her liberty demands competent and relevant evidence and findings of fact to be based upon clear, cogent, and convincing evidence at the involuntary commitment hearing. This Court reviews an involuntary commitment order "to determine whether the ultimate finding concerning the respondent's danger to self or others is supported by the court's underlying findings, and whether those underlying findings, in turn, are supported by competent evidence." *In re W.R.D.*, 248 N.C. App. 512, 515, 790 S.E.2d 344, 347 (2016) (citation omitted).

¶ 16    On issues of admission and credibility of the evidence this Court does "not consider whether the evidence of respondent's mental illness and dangerousness was clear, cogent and convincing," *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980), as that "is for the trier of fact to determine." *In re Underwood*, 38 N.C. App. 344, 347, 247 S.E.2d 778, 781 (1978).

The trial court's conclusions of law to involuntarily commit and deprive Respondent of her liberty must be supported by its findings of fact and supporting evidence on each required statutory element and those conclusions are reviewed *de novo* on appeal. *Id.* The State's *quantum* of evidence must meet and sustain its burden of proof. *See* N.C. Gen. Stat. § 122C-268(j) (2021); *Woodard v. Mordecai*, 234 N.C. 463, 472, 67 S.E.2d 639, 645 (1951) ("Whether a statement is an ultimate fact or a conclusion of law depends upon whether it is reached by natural reasoning or by an application of fixed rules of law.") (citations omitted)). Our colleague's separate opinion misstates this Court's duty and role to review conclusions of law. If this Court were to adopt the separate opinion's standard of review, the logical conclusion of that standard deprives Respondent of *any* effective appellate review. *In re Duvall*, 268 N.C. App. 14, 18, 834 S.E.2d 177, 181 (2019); *see* N.C. Gen. Stat. § 7A-32(c) (2021) ("The Court of Appeals has jurisdiction . . . to supervise and control the proceedings of any of the trial courts of the General Court of Justice[.]").

## B. Dangerousness to Self

A respondent may be found to be dangerous to herself under the requirements of the statute if, "[w]ithin the relevant past," she has demonstrated the following:

> I. The individual would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations, or to satisfy the

individual's need for nourishment, personal or medical care, shelter, or self-protection and safety.

II. There is a reasonable probability of the individual's suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself or herself.

N.C. Gen. Stat. § 122C-3(11)(a)(1) (2021).

Here, the trial court's order finds and concludes Respondent's involuntary commitment is required, and it concluded Respondent's "[n]on-compliance [with] medication, the lack of stable housing and lack of insight into her condition, taken together, pose a [ ] serious risk of rapid decompensation if in the community. She therefore poses a significant danger to herself."

Because these findings are supported by creditable relevant evidence, the trial court concluded State-Petitioner had met its burden of proof under the statute. Since findings of fact support the trial court's conclusion of involuntary commitment of Respondent, we affirm the trial court's order, and we need not address Respondent's other argument concerning whether involuntary commitment is proper based on any danger to herself posed by injurious self-examination.

### 1. *Inability to Satisfy Healthcare Needs*

¶ 21        In challenging the trial court's determination that she is unable to adequately provide for her own medical care, Respondent first argues that "it was undisputed that [she] *voluntarily* arrived at Central Regi[o]nal Hospital seeking medical care." Presuming this fact is true, this assertion misses the mark in two respects:

¶ 22        First, the trial court expressly found Respondent's testimony not credible in its recitation of the oral findings, which were later incorporated into the written commitment order.  We do not "second-guess" the trial court's evaluation of Respondent's and the other properly admitted witnesses' credibility.  *See In re A.B.C.*, 374 N.C. 752, 761, 844 S.E.2d 902, 909 (2020) (noting in a juvenile case that when the trial court sits and hears testimony as a finder of fact, "it is not the role of this Court to second-guess the trial court's credibility determination") (citation omitted).

¶ 23        Second, Respondent testified she had voluntarily sought medical care for a uterine or gastrointestinal blockage, a condition the expert treating physicians addressed in their testimony and which the trial court found to be non-existent and a subject of Respondent's persistent delusions.  These unchallenged findings are binding upon appeal.  *In re Moore*, 234 N.C. App. 37, 43, 758 S.E.2d 33, 37 (2014).

¶ 24        These delusions, recounted in the physicians' testimony and the trial court's findings, became evident when Respondent testified, she has no mental health issues, does not need medication for mental illness, and requires copious amounts of laxatives on a daily basis to treat her asserted uterine or gastrointestinal blockages

and obstruction(s). To the extent Respondent presented and sought, and continued to seek, medical treatment, the tests showed she did so for an imagined ailment, the physicians testified, and the trial court found does not exist, and Respondent is in denial and neglect of ongoing diagnosed mental illness(es). The trial court's supported findings and its conclusions thereon disclose Respondent, "in the relevant past," has acted in a way that demonstrates a present inability to provide for her medical care, as is required by N.C. Gen. Stat. § 122C-3(11)(a)(1)(I) (2021).

## 2. *Inability to Satisfy Need for Shelter*

Respondent challenges the trial court's finding that Respondent "lacks stable housing." Respondent correctly and rightly points out that she had previously lived in an apartment and at several hotels prior to her initial commitment. Dr. Gettings testified from hearsay "what I understand, that [Respondent's] condo is in a state of disarray to such a severe level that she was not able to continue inhabiting that housing which has then, in turn, led to her living in short-stay hotels. That's—those are not—you know, she's essentially homeless."

Dr. Gettings further testified his attempts to qualify Respondent for a transitional living program was "put on hold," because of "very significant concerns about [Respondent]'s stability and ability to sort of live independently[.]" These portions of Dr. Gettings' testimony were elicited on cross-examination without objection, and any objections thereto are waived. *See In re A.J.D.*, 283 N.C. 1, 7,

2022-NCCOA-258, ¶ 17, 871 S.E.2d 575, 578 (2022) ("[A] review of the Record reveals Respondent did not object to the admission of Dr. Zarzar's testimony on any basis, including impermissible hearsay. As such, Respondent failed to preserve this issue for appellate review." (citing *In re F.G.J.*, 200 N.C. App. 681, 693, 684 S.E.2d 745, 753-54 (2009)); *State v. Gobal*, 186 N.C. App. 308, 319, 651 S.E.2d 279, 287 (2007) ("Statements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law." (citation omitted)).

¶ 27   While Respondent's testimony concerning her housing contradicted Dr. Gettings' hearsay assertions, his testimony supports the trial court's finding and conclusion that Respondent "lacks stable housing." The trial court resolves conflicts in the evidence and determines whether Dr. Gettings' testimony was creditable. *In re J.C.D.*, 265 N.C. App. 441, 448, 828 S.E.2d 186, 191-92 (2019). The record contains a finding, assertedly based upon "clear, cogent and convincing" evidence, that Respondent is unable to adequately meet her needs for shelter within the relevant past pursuant to N.C. Gen. Stat. § 122C-3(11)(a)(1)(I). *Collins*, 49 N.C. App. at 246, 271 S.E.2d at 74. Even if unsupported, other properly supported facts support the trial court's conclusion.

### 3. *Reasonable Probability of Serious Physical Debilitation in Near Future*

¶ 28        Respondent argues the trial court failed to make adequate findings to support a conclusion that a reasonable probability exists of her serious physical debilitation in the near future. She asserts no finding disclosing such probable harm and "[t]here was simply no evidence that, even if [Respondent] refused to take mental health medication upon discharge, . . . her failure to take the medication would create a serious health risk in the near future."

¶ 29        The trial court expressly found Respondent was presently unable to meet her health and housing needs, and when "taken together, pose[s] serious risk of rapid decompensation if in the community." This Court has upheld conclusions of the need for involuntary commitments for dangerousness-to-self based on substantially similar findings. *See In re Moore*, 234 N.C. App. at 44-45, 758 S.E.2d at 38 ("The trial court found that respondent 'is at a high risk of decompensation if released and without medication,' and that Dr. Fahs thought respondent, if released, would 'relapse by the end of [the] football season.' The trial court's findings indicated respondent was a danger to himself in the future. The trial court properly found that respondent is a danger to himself because there is a reasonable possibility that he will suffer serious physical debilitation in the near future.").

¶ 30        Further, the trial court's finding that Respondent is at "serious risk of *rapid* decompensation" satisfies N.C. Gen. Stat. § 122C-3(11)(a)(1)(II)'s requirement of a

temporal finding of "reasonable possibility" of "serious physical debilitation *in the near future*." *Id.* (emphasis supplied).

¶ 31    The trial court's finding and conclusion of a reasonable probability of serious physical debilitation exists "in the near future" is also supported by other evidence. *Id.* When asked by the State if "it's reasonably probable in the near future, if she's discharged with her delusions, that she could suffer physical debilitations," Dr. Gettings testified "I do [sic]. . . . I would worry that, if we don't have her fully—fully treated and fully at her baseline, she has a high risk of decompensating and requiring repeat or further hospitalization in the future."

¶ 32    The trial court also incorporated Dr. Gettings' report into its order, which states Respondent "has remained psychotic and delusional . . . [and] *at present* represents a danger to herself if discharged in her current condition." (emphasis supplied). The trial court's conclusion that Respondent is at risk of rapid decompensation due to her inability to manage her medical and immediate housing needs is supported by findings of fact based upon clear, cogent, and convincing evidence in the record.

## V.    Conclusion

¶ 33    The trial court could order the involuntarily commitment of Respondent, if Petitioner met its burden of proof by clear, cogent, and convincing evidence to prove she was unable to care for her health or need for shelter in the relevant past and of a

reasonable possibility of physical debilitation in the near future.  N.C. Gen. Stat. § 122C-3(11)(a)(1)(I)-(II).

¶ 34       The trial court found Respondent's "[n]on-compliance with medication, the lack of stable housing and lack of insight into her condition, taken together, pose a[ ] serious risk of rapid decompensation if in the community.  She therefore poses a significant danger to herself."

¶ 35       These findings are supported by clear, cogent, and convincing evidence.  The trial court's findings of fact and conclusions of law of Respondent being mentally ill and being dangerous to herself is supported by evidence in the record.  The trial court's order is affirmed.  *It is so ordered.*

AFFIRMED.

Judge GORE concurs.

Judge INMAN concurs in result only by separate opinion.

No. COA21-694 – *In re E.B.*

INMAN, Judge, concurring in the result.

I agree with the majority that the trial court's involuntary commitment order should be affirmed, but I respectfully disagree with the standard of review it employs in resolving this appeal. Under the proper standard applicable to involuntary commitment orders, competent record evidence supports the trial court's findings of fact, and those findings of fact support the ultimate finding of dangerousness to self. Applying this well-established framework, I concur in the result.

To order an individual's involuntary inpatient commitment, "the [trial] court shall *find* by clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self . . . or dangerous to others . . . . The court shall record the facts that support its *findings*." N.C. Gen. Stat. § 122C-268(j) (2021) (emphasis added). Consistent with the statute's language, dangerousness to self has long been (and remains) understood as an ultimate finding of fact. *See In re Hogan*, 32 N.C. App. 429, 433, 232 S.E.2d 492, 494 (1977) ("Whether a person is mentally ill . . . and whether he is imminently dangerous to himself or others, present questions of fact."); *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980) ("To enter the commitment order the trial court was required to *ultimately find two distinct facts*, *i.e.*, that the respondent was mentally ill and was dangerous to himself or to others." (emphasis added) (citation omitted)); *In re A.J.D.*, 2022-NCCOA-258, ¶ 15 ("Findings of mental illness and dangerousness to self are ultimate findings of fact." (citation and quotation marks omitted)).

¶ 38        Though occasionally difficult to differentiate, ultimate findings of fact are

distinct from both evidentiary facts and conclusions of law:

> There are two kinds of facts: Ultimate facts, and
> evidentiary facts.  Ultimate facts are the final facts
> required to establish the plaintiff's cause of action or the
> defendant's defense; and evidentiary facts are those
> subsidiary facts required to prove the ultimate facts.
>
> . . . .
>
> Ultimate facts are those found in that vaguely defined area
> lying between evidential facts on the one side and
> conclusions of law on the other.  In consequence, the line of
> demarcation between ultimate facts and legal conclusions
> is not easily drawn.  An ultimate fact is the final resulting
> effect which is reached by processes of logical reasoning
> from the evidentiary facts.  Whether a statement is an
> ultimate fact or a conclusion of law depends upon whether
> it is reached by natural reasoning or by an application of
> fixed rules of law.

*Woodard v. Mordecai*, 234 N.C. 463, 470-72, 67 S.E.2d 639, 644-45 (1951) (citations

omitted).

¶ 39        Consistent with the above distinctions between ultimate findings of fact and

conclusions of law, this Court held more than four decades ago that ultimate findings

of mental illness and dangerousness are *not* to be treated or analyzed as conclusions

of law.  *Hogan*, 32 N.C. App. at 433, 232 S.E.2d 492 at 494 ("In the order appealed

from in the present case the court purported to make these determinations [of mental

illness and dangerousness] as 'matters of law.'  We will ignore the incorrect

designation and treat the court's conclusions as findings of the ultimate facts required by [the then-applicable involuntary commitment statute].").

¶ 40      In *In re Whatley*, this Court equated, without authority and in passing, ultimate findings of mental illness and dangerousness with conclusions of law. 224 N.C. App. 267, 271, 736 S.E.2d 527, 530 (2012) ("The trial court must also record the facts that support its 'ultimate findings,' i.e., conclusions of law, that the respondent is mentally ill and dangerous to himself or others."). To the extent that this statement in *Whatley* amounts to more than mere *dicta*, it is in direct conflict with: (1) *Woodard*'s distinction between ultimate findings and conclusions of law, 234 N.C. at 470-72, 67 S.E.2d at 644-45; (2) undisturbed precedents establishing mental illness and dangerousness as ultimate findings of fact, *Hogan*, 32 N.C. App. at 433, 232 S.E.2d 492 at 494; and (3) the applicable statute requiring the trial court to "find" a respondent mentally ill and dangerous in order to involuntarily commit her, N.C. Gen. Stat. § 122C-268(j). Because one panel of this Court cannot overrule another and we are required to follow our Supreme Court's precedents, *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989), *Whatley*'s conflation of ultimate findings of mental illness and dangerousness with conclusions of law is not binding.

¶ 41      When an appellant challenges the trial court's ultimate finding of dangerousness in an involuntary commitment order, our longstanding standard of review is straightforward: "We review the trial court's commitment order to

determine whether the ultimate finding concerning the respondent's danger to self or others is supported by the court's underlying findings, and whether those underlying findings, in turn, are supported by competent evidence." *In re W.R.D.*, 248 N.C. App. 512, 515, 790 S.E.2d 344, 347 (2016). I can find no published decision before or after *Hogan* purporting to apply *de novo* review to ultimate findings of mental illness and dangerousness, and we have explicitly rejected that standard in at least one unpublished decision of this Court. *See In re E.L.*, 268 N.C. App. 323, 834 S.E.2d 189, 2019 WL 5726811, *1 (unpublished) (refusing, based on *Hogan*, to apply the *de novo* standard urged by an appellant to ultimate findings of mental illness and dangerousness).

¶ 42        Our review in applying the competent evidence standard is not unfettered. "It is for the trier of fact to determine whether evidence offered in a particular case is clear, cogent, and convincing. *Our function on appeal is simply to determine whether there was any competent evidence to support the factual findings made.*" *In re Underwood*, 38 N.C. App. 344, 347-48, 247 S.E.2d 778, 781 (1978) (emphasis added) (citations omitted). "*We do not consider* whether the evidence of respondent's mental illness and dangerousness was clear, cogent and convincing. It is for the trier of fact to determine whether the competent evidence offered in a particular case met the burden of proof." *Collins*, 49 N.C. App. at 246, 271 S.E.2d at 74 (emphasis added) (citing *Underwood*, 38 N.C. App. at 347, 247 S.E.2d at 781).

¶ 43        The majority recognizes some of the caselaw concerning the proper standard of review while deviating from precedents in key respects.  Its assertions that the ultimate findings of mental illness and dangerousness to self are conclusions of law and that the involuntary commitment thereunder is subject to *de novo* review ignores prior decisions establishing: (1) mental illness and dangerousness as ultimate findings rather than legal conclusions, *Hogan*, 32 N.C. App. at 433, 232 S.E.2d 492 at 494; and (2) the proper standard of review applicable to those ultimate findings, *see, e.g., W.R.D.*, 248 N.C. App. at 515, 790 S.E.2d at 347.

¶ 44        In supporting its assertion of *de novo* review, the majority misstates the standard applied in *Underwood*.  That decision treats dangerousness as an ultimate finding and does not employ *de novo* review:

> Our function on appeal is simply to determine whether there was any competent evidence to support the factual findings made.  . . . [T]he petitioner's testimony furnished competent evidence to support the trial court's factual findings . . . .  These factual findings in turn furnished ample support for the court's ultimate findings that respondent was mentally ill and imminently dangerous to self or others . . . .

38 N.C. App. at 347-48, 247 S.E.2d at 781.  Relatedly, I disagree with the majority's repeated misnomer of the trial court's ultimate findings in this case as legal "conclusions."

¶ 45  The majority's claim that the well-established standard of review set forth in this concurring opinion "deprives Respondent of any effective appellate review, including constitutional claims . . . and issues of statutory interpretation and application," ignores the more than forty years of caselaw reviewing *and reversing* involuntary commitment orders under precisely this standard. *See e.g., Hogan*, 32 N.C. App. at 434, 232 S.E.2d at 495 (reversing an involuntary commitment order because the underlying findings were unsupported by competent evidence and did not support the ultimate findings). Respondent has not challenged the constitutionality of her involuntary commitment, and she has not presented any argument concerning statutory interpretation. Nor has she requested *de novo* review. Instead, her brief simply asks that we employ the exact standard applied in decades of caselaw and in this concurring opinion.

¶ 46  I similarly decline to adopt the majority's several assertions that the trial court's "findings are supported by clear, cogent and convincing evidence," as such judgments on the weight of the evidence are beyond this Court's purview. *See id.* at 347-48, 247 S.E.2d at 781; *Collins*, 49 N.C. App. at 246, 271 S.E.2d at 74. Stated simply, because this Court is not authorized to consider whether evidence is clear, cogent, and convincing, we should not purport to decide that issue.

¶ 47  Even though I believe the majority applies the wrong standard of review, I reach the same result applying the correct standard. The evidence recited in the

majority opinion is competent to support the trial court's evidentiary findings that Respondent is unable to manage her own medical and housing needs and is at rapid risk of decompensation if released. Those evidentiary findings, in turn, support the trial court's ultimate finding that Respondent is dangerous to herself. I therefore concur in the result affirming the trial court's order.